UNITED STATES of America

v.

**David Ronald CHANDLER,
a/k/a Ronnie Chandler.**

Nos. CR90–H–266–E, CV95–H–8006–E.

United States District Court,
N.D. Alabama,
Eastern Division.

Dec. 17, 1996.

John R. Martin, Natasha Zalkin, Atlanta, GA, for Plaintiff.

Harwell G. Davis, III, Huntsville, AL, for Defendant.

**ORDER DENYING CLAIMS III D THROUGH III O OF DEFENDANT'S MOTION TO VACATE AND FOR A NEW TRIAL, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW ASSOCIATED WITH EVIDENTIARY HEARINGS HELD OCTOBER 31, NOVEMBER 1, AND NOVEMBER 3, 1995**

HANCOCK, Senior District Judge.

Presently before the Court is defendant Chandler's motion, pursuant to 28 U.S.C. § 2255 and Rule 33, Fed.R.Crim.P., to vacate his conviction and sentence and for a new trial. This motion has been amended several times; the most recent version of the motion was filed on October 10, 1995, and this version was amended to add one new claim on January 18, 1996.

*Background*

David Ronald Chandler was convicted in this Court on April 2, 1991 on all nine counts of a superseding indictment. Count I of the indictment charged Chandler (along with 15 codefendants) with conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana or more than 1,000 marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii), and 846.

Count II charged Chandler with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a). Counts IV and V charged Chandler with using a firearm in furtherance of the commission of drug offenses, in violation of 18 U.S.C. § 924(c)(1). Counts VI through IX charged Chandler with various money laundering transactions under 18 U.S.C. § 1956(a)(1). Finally, and most significantly, Chandler was charged in Count III of committing a murder in connection with a continuing criminal enterprise, in violation of 21 U.S.C. § 848(e)(1)(A). The government sought the death penalty under Count III, and on April 3, 1991, the jury unanimously found that Chandler should receive the death penalty. Chandler appealed his conviction, and the Eleventh Circuit affirmed on July 19, 1993. *See United States v. Chandler*, 996 F.2d 1073. Chandler's motion for rehearing and rehearing *en banc* was denied on September 30, 1993, and the Supreme Court denied certiorari on June 20, 1994. *See* 512 U.S. 1227, 114 S.Ct. 2724, 129 L.Ed.2d 848. On March 20, 1995, Chandler filed his petition to vacate his conviction and sentence and for a new trial pursuant to 28 U.S.C. § 2255 and Rule 33, Fed.R.Crim.P. After several amendments, that petition raises approximately 90 grounds for relief.

What follows is a synopsis of the evidence that was presented at Chandler's trial. After discussing that evidence, the Court will summarize the course of proceedings that has occurred so far with regard to Chandler's § 2255/Rule 33 motion, followed by a disposition on the merits of approximately two-thirds of the claims raised in the motion, numbered III D through III O. The remaining claims, numbered III A through III C, are the subject of a separate Order entered this day.

Paul Watson, one of Chandler's co-conspirators, began the government's case by testifying about the details of Chandler's marijuana dealings in 1989 and 1990. Watson testified about six runs to Texas to procure various amounts of marijuana ranging from 30 to 200 pounds; these trips were made by Charles Ray Jarrell, Richard Fields, or both. (Tr. 3–57 to –72).[1] On one trip, Fields was stopped and arrested with $106,000 in cash while on his way to make a purchase in Texas. (Tr. 3–71 to –72).[2]

Watson also testified about obtaining approximately 100 pounds of marijuana for Chandler from Fred Moncrief, another co-conspirator. (Tr. 3–74 to –76). After these transactions, Watson and Chandler arranged to purchase an additional 100 pounds of marijuana from Moncrief, and the two headed to Georgia (where Moncrief lived) on May 30, 1990 with approximately $85,000 to make the purchase. (Tr. 3–78 to –81). As it turned out, Moncrief's source for the marijuana was Georgia Bureau of Investigation Agent Patrick Skinner, and Moncrief, Chandler, and Watson were all arrested on May 30 by the Georgia authorities. (Tr. 3–84 to –85).[3]

Watson also testified about some other, smaller transactions in which he purchased five to ten pounds of marijuana from Chandler on each of several occasions. (Tr. 3–100 to –108). Watson related a conversation he had with Chandler regarding the cultivation of marijuana, in which Chandler told Watson that he usually planted around 5,000 marijuana plants per year. (Tr. 3–109).

Charles Ray Jarrell, Sr., also testified about Chandler's marijuana dealings. Jarrell testified that he was living with Chandler, doing odd jobs, and Chandler employed him to guard two marijuana patches. (Tr. 3–

---

1. Citations to the trial transcript are denoted "Tr."; references to the May 30, 1995 evidentiary hearing transcript are denoted "5/95 Tr."; citations to the October 31/November 1/November 3, 1995 evidentiary hearing are noted as "11/95 Tr."

2. The officer who arrested Fields, Ed Dupis, also testified about the seizure of the $106,000. *See* Tr. 5–91 to –99.

3. Watson was waiting inside Moncrief's residence when Moncrief returned with Agent Skinner. According to Watson, Chandler went outside to meet them, but then attempted to flee when he learned Skinner's true identity. (Tr. 3–84). Watson emerged from the house and discovered that Moncrief and Skinner were accompanied by a "van load of law," but did not run. (*Id.*). For Agent Skinner's essentially identical account of the transaction and arrest, *see* Tr. 6–55 to –70.

186 to –88).[4] Jarrell also testified that he drove Chandler and Bobby J. Steed (another co-conspirator) out into the woods so that Chandler and Steed could dig several hundred marijuana patches. (Tr. 3–191 to –94). Jarrell stated that the three men recorded the locations of these patches in notebooks that they kept, with each man using a different code that only that person understood. (Tr. 3–194). Charles Ray also testified about the details of the several marijuana runs he and Richard Fields had made to Texas for Chandler. (Tr. 3–196 to –219).[5]

Waylon Motes, like Charles Ray Jarrell, testified about Chandler's marijuana growing activities. Motes stated that he had helped Chandler prepare and fertilize approximately 100–125 marijuana plots. (Tr. 4–173 to –176). Motes testified that Chandler kept track of these plot locations by recording them in a small notebook. (Tr. 4–176 to –177). After preparing marijuana seeds for planting, Motes testified that he and Chandler planted "several thousand" marijuana plants at these prepared locations in the woods. (Tr. 4–179 to –84). Eventually, Motes and Chandler harvested the plants and stored the prepared marijuana in buried trash cans. (Tr. 4–187 to –191). Motes testified that Chandler arranged for the sale of the marijuana, and that Motes' share of the profit was $65,000. (Tr. 4–192 to –193).

Further evidence of Chandler's growing activities came from Johnny Lowe, an employee of a farming cooperative in Georgia. Lowe testified that Chandler had, on each of two occasions, purchased 10,000 pounds of slow release fertilizer from Lowe's employer, with the sales being arranged by Lowe. (Tr. 5–228 to 229). Another employee of the cooperative, Albert Lindsey, testified about delivering the two loads of fertilizer to Chandler in Piedmont. (Tr. 6–19 to –25).

Jay Howell, an Alabama narcotics officer, testified about participating in a search of Bobby J. Steed's residence, at which time he found a notebook. (Tr. 7–59 to –62). Howell testified that Charles Ray Jarrell assisted him in visiting 20 of the marijuana plot locations described in the notebook. (Tr. 7–62 to –84). Howell catalogued the number of plants found at each location, compared those numbers to those in the notebook, and testified that there was a "rough correspondence" between the numbers in the notebook and those in the 20 plots visited. (Tr. 7–79). Howell testified that, from examining the notebook, it appeared to list the locations of 110 marijuana plots, totaling 5,083 plants. (Tr. 7–80 to –81).

One person who sold marijuana for Chandler was Donna Shuler. *See generally* Tr. 4–63 to –67 (testimony of Raymond Pointer); 5–123 to –33 (testimony of James Emigh). On several occasions, Marlin Shuler, Donna Shuler's ex-husband, had complained to Ricky Doyal, the Piedmont Chief of Police, about Donna Shuler's drug trafficking activities. (Govt's Ex. 73). Based in part on Marlin Shuler's information, Doyal obtained and executed a search warrant for Donna Shuler's residence, *see* Govt's Ex. 74, marijuana was found, and Donna Shuler was arrested. *See generally* Tr. 7–43 to –46. At a pretrial proceeding, Donna Shuler was represented by attorney William Broome, who obtained a copy of the search warrant and Doyal's supporting affidavit and gave these to her. (Tr. 7–121 to –29). Contained in Doyal's affidavit was a statement that Marlin Shuler had complained three times about Donna Shuler's illegal activities. (Govt's Ex. 73). Donna Shuler later obtained a second copy of the search warrant and affidavit, claiming that she had misplaced the copies she had previously received. (Tr. 7–128 to –129).

The government then offered evidence indicating that Donna Shuler had communicated the contents of Doyal's affidavit to Chandler. Through witness Tim Whatley (a law enforcement official who participated in a search of Chandler's residence), the government introduced "the Calvin Klein advertisement," a scrap of paper found in Chandler's home that had notes written on it. (Tr. 8–36; Govt's Ex. 85). Among many other words

---

**4.** Jarrell also testified that the only source of income he had in 1989 and 1990 was Chandler. (Tr. 4–58).

**5.** For Richard Fields' essentially identical testimony about the Texas runs, *see* Tr. 5–30 to –58.

scattered on the Calvin Klein ad were the words "Bill Broome" and "copy of police report." (Govt's Ex. 85). The government later argued that these entries suggested that Chandler had received a copy of the police report and other documents from the search of Donna Shuler's residence. (Tr. 10–168). In addition, Raymond Pointer testified that Chandler had told him that Marlin Shuler was a "rat" who couldn't be trusted, because Shuler had "supposedly gone and busted somebody in Piedmont." (Tr. 4–75 to –77).

The government then proceeded to present evidence that Chandler had solicited the murder of Shuler in retaliation for Shuler's cooperation with the Piedmont Police. Raymond Pointer testified that Chandler had offered him $5,000 to kill Shuler, and also offered to pay Pointer to kill Ricky Doyal. (Tr. 4–76). In addition, another potential victim, Kathy Jarrell, was mentioned, "[b]ecause she was supposed to be in on it with Marty [Marlin Shuler] on telling on Donna." (Tr. 4–77 to –78). Pointer declined these offers. (Tr. 4–80).

The centerpiece of the government's evidence linking Chandler to the Shuler murder was the testimony of Charles Ray Jarrell. Jarrell admitted that he shot and killed Shuler. (Tr. 3–219). Jarrell testified that, in about February of 1990, Chandler had remarked that "[y]ou ought to take care of that Shuler," and offered Jarrell $500 to do the job. (Tr. 3–220). Jarrell stated that he did not take Chandler seriously at that time. (Id.). On the morning of May 8, 1990, Shuler was at Jarrell's residence, and Chandler showed up; Chandler told Jarrell that Shuler "is going to cause us a lot of trouble." (Tr. 3–220 to –222). Jarrell testified that, at that point, Chandler said "you better go on and get rid of him," and "I still got that five hundred dollars." (Tr. 3–222). Jarrell and Chandler had no further conversation about Shuler at that time. (Id.).

After Chandler left, Jarrell and Shuler stayed at Jarrell's residence drinking beer for about an hour, and the two then decided to go to an area called Snow's Lake to en-

gage in target practice. (Tr. 3–224). They purchased a case of beer along the way, Id., and after they arrived at Snow's lake, Jarrell shot and killed Shuler. (Tr. 3–226). According to Jarrell, he drove to Chandler's residence immediately following the shooting, told Chandler what had happened, and he and Chandler returned and buried Shuler's body. (Tr. 3–226 to –28). They then took Shuler's automobile to another location, doused it with gasoline, and set it on fire. (Tr. 3–228 to –29).

Chandler's attorney elicited on cross-examination that Marlin Shuler was married to Jarrell's sister, Donna, and that Marlin would frequently drink, go into "crazy rages," and physically abuse Donna. (Tr. 3–242).[6] Jarrell also related twice—once on cross-examination and once on direct during the defense's case in chief—an incident in which he was present during a domestic quarrel between Marlin and Donna Shuler. (Tr. 4–41 to 46). Jarrell became angry with Marlin Shuler, pulled out a handgun, and pointed it at point-blank range at Marlin Shuler's face. (Tr. 8–109 to –110). Then, Jarrell pulled the trigger, intending to shoot Shuler in the face, but the pistol malfunctioned and failed to fire. (Tr. 8–110 to –112). Jarrell admitted that this attempt to kill Shuler, which occurred in late 1989, was motivated purely by Jarrell's resentment of Shuler's abuse, and not by any promise of money from Chandler. (Tr. 8–112). However, Jarrell also testified that he was not angry with Shuler on the day of the murder, and killed Shuler because of Chandler's promise of $500. (Tr. 4–57 to –59).

The government also introduced testimony, under Rule 404(b), that implicated Chandler in the apparent murders of two other individuals, Patrick Burroughs and Jeff McFry. Both men disappeared and were never found; it was assumed that they had been murdered. (Tr. 7–48 to –49). Charles Ray Jarrell testified that he heard Chandler complain about Burroughs stealing marijuana from him, and that Chandler said "I'm going to get him." (Tr. 3–231). Melissa McFry testified that Chandler suspected Jeff

**6.** For other details of Marlin Shuler's abuse of Donna Shuler and Imogene Johnson (mother of · Jarrell and Donna Shuler), *see* Tr. 4–45 to –46, 8–154.

McFry of stealing marijuana from Chandler's plots, and that Chandler said that he would kill McFry if he caught him stealing Chandler's marijuana again. (Tr. 4–137). Toby Barnwell related discussions with Chandler in which Chandler told him that Burroughs and McFry were stealing marijuana, and on a later date Chandler had another discussion with Barnwell at a Huddle House restaurant in Piedmont. (Tr. 4–151 to –52). On that occasion, according to Barnwell, Chandler told Barnwell that Burroughs "won't be around these parts no more," because he was dead. (Tr. 4–152). Chandler also told Barnwell to tell Jeff McFry that "he was going to be next." (*Id.*).

After hearing the evidence, closing arguments, and jury charge, the jury retired to begin deliberations, and returned a verdict of guilty on all counts the next day, April 2, 1991. On April 3, 1991, Chandler's trial moved into the sentencing phase prescribed by 21 U.S.C. § 848(i). The government sought to prove three aggravating factors regarding the Shuler murder: (1) that Chandler intentionally engaged in conduct intending that Shuler be killed, and that Shuler had actually been killed as a result (21 U.S.C. § 848(n)(1)(C)); (2) that Chandler procured Shuler's murder through payment or promise of payment of money (§ 848(n)(6)); and (3) that Chandler had procured the Shuler murder after substantial planning and premeditation (§ 848(n)(8)). The government did not introduce any new evidence at the sentencing hearing, instead relying on what had been introduced at the guilt/innocence phase. Chandler's trial counsel introduced stipulations at the sentencing hearing, one of which recited that Chandler had no substantial criminal history (§ 848(m)(6)). Another recited that Charles Ray Jarrell would not be prosecuted for the Shuler murder (as part of his agreement with the government), and so could not receive the death penalty. Trial counsel used this stipulation to argue that Chandler should not receive the death penalty because an equally culpable person (Charles Ray Jarrell) would not be punished with death. *See* § 848(m)(8). Third, trial counsel offered a stipulation concerning government's exhibit 45, which was a tape recording in which Chandler said that if he were "set up" again, he would have to kill someone. The stipulation was that government's exhibit 45 was recorded almost two months after the Shuler murder. Chandler's trial counsel was interested in establishing this fact because, during its deliberations in the guilt/innocence phase, the jury had requested that government's exhibit 45 be played again.

Chandler's trial counsel also offered the testimony of Chandler's wife and mother. These two witnesses testified briefly about Chandler's family background. (Tr. 12–33 to –44).

After hearing this new evidence and the attorneys' closing arguments, the jury was instructed and retired to deliberate at 12:13 p.m. (Tr. 12–96). The jury returned a verdict at 3:05 p.m. (Tr. 12–97). That verdict contained a unanimous finding that the government had established beyond a reasonable doubt that Chandler had engaged in conduct intending that Shuler be killed, and that Shuler was killed as a result. The jury also unanimously found beyond a reasonable doubt that Chandler had procured the Shuler murder by promise or payment of money. However, the jury found that the government had not proven that the murder was accompanied by substantial planning or premeditation. The jury unanimously recommended a death sentence.

After Chandler's direct appeals were exhausted, he filed the present petition. The Court has already held two evidentiary hearings regarding Chandler's claims: one on May 30, 1995, and a second on October 31, November 1, and November 3, 1995. A third hearing, scheduled for February 10, 1997, is set by another Order entered this same day. For scheduling purposes, the Court divided up Chandler's claims into two sections: one group of claims, numbered III D through III O, and another group numbered III A through III C. As observed in the October 11, 1995 Order, an evidentiary hearing was unnecessary for claims III D through O, inclusive, except for claims III D 2 e, III D 2 h, III D 2 k, and III D 3 a. Under the October 11, 17, 23, and 26, 1995 Orders, an evidentiary hearing was held with regard to

those excepted claims. The Court has received extensive briefing, proffers of evidence, and responses from both parties on the issues raised by claims III D through III O, and those issues are now under submission pursuant to the Orders entered October 11 and November 3, 1995.

The purpose of the current Order is to address the merits of the claims set forth in sections III D through III O, inclusive, and in connection therewith make findings of fact and conclusions of law associated with the October 31, November 1, and November 3, 1995 evidentiary hearing. Claims III A through III C are addressed in the separate Order entered today.

### III D: Ineffective Assistance of Trial Counsel

The bulk of the claims raised in Chandler's petition are claims of ineffective assistance of counsel, at every stage of the proceedings so far. These claims are all governed by the two-prong inquiry set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail, Chandler must show both deficient performance by his attorney *and* prejudice from that inadequate performance. *Id.* at 687, 104 S.Ct. at 2064. Chandler bears the burden of establishing both of these elements by a preponderance of the evidence. *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir.1995).

In assessing the *Strickland* performance prong, the relevant inquiry is whether counsel's actions (or omissions) were within the "wide range" of objectively reasonable professional conduct. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir.1995). However, the Supreme Court has warned that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. The court is to avoid "the distorting effects of hindsight" and "evaluate the conduct from counsel's perspective at the time" the challenged decision was made. *Id.* In addition, the Court begins the performance inquiry with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Finally, if the challenged action was the result of a "reasonable tactical deci-

sion," made after adequate investigation, it becomes "virtually unchallengeable," "and the inquiry is generally at an end." *Mills*, 63 F.3d at 1024.

Regarding the *Strickland* prejudice prong, Chandler has the burden to satisfy the Court that, absent counsel's unprofessional conduct, there is a "reasonable probability" that the result of the trial would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial, due to a failure of the adversarial process. *Id.* However, Chandler need not prove that counsel's errors "determined the outcome" of his trial; the "reasonable probability" standard does not require proof that the outcome of the trial probably would have been different absent the error. *Id.*

These dual heavy burdens of proof shouldered by a defendant claiming ineffective assistance make the cases in which such claims succeed "few and far between." *Waters*, 46 F.3d at 1511. It is with these standards in mind that the Court turns to Chandler's claims of ineffective assistance.

### III D 1: Ineffectiveness during jury selection

a. *Failure to challenge the Northern District's practice of drawing jurors from the entire district, rather than just the Eastern Division*

Chandler first argues that the Northern District's method of jury selection violates the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.* More particularly, Chandler argues that this District's practice of summoning jurors from the population of the entire district, rather than the division in which the crime is alleged to have occurred, violates the Act. According to Chandler, his trial counsel should have raised this challenge at trial, and his failure to do so was an omission below the objective standards of reasonableness required by the Sixth Amendment. In addition, Chandler asserts that, had the Court drawn his jury from the Eastern Division alone, the jury pool would have contained more black potential jurors, whom Chandler asserts would have been

more sympathetic to him at trial, and thus would have been less likely to convict.

The government responds to this claim in two ways. First, it contends that this District's jury selection plan is in full compliance with the Jury Selection and Service Act, and so any challenge raised by Chandler's trial counsel would have been properly rejected. Second, the government notes that there is nothing in the record to suggest that Eastern Division jurors would be more sympathetic or less likely to convict; although the percentage of potential black jurors in the Eastern Division is slightly higher than that of the District as a whole,[7] both Chandler and the man whose murder he was convicted of, Marlin Shuler, were white, and the case carried no racial overtones. Thus, argues the government, there is no reasonable probability that a jury drawn from the Eastern Division would have acquitted Chandler or given him a lesser sentence.

■ The Court agrees that this claim is ill-founded. In *United States v. Grisham,* 841 F.Supp. 1138, 1147–48 (N.D.Ala.1994), Judge Nelson undertook a thorough analysis of this District's jury selection plan under the Jury Selection and Service Act, and concluded that there was no violation. Most of the other judges in this district concurred in Judge Nelson's opinion, including the undersigned. On appeal, the Eleventh Circuit affirmed, but did not reach the Jury Selection and Service Act issues. *See* 63 F.3d 1074, 1082 n. 11 (11th Cir.1995). However, this Court will adhere to the decision in *Grisham.*

■ In addition, there is nothing in the record (apart from Chandler's counsel's speculation) that can serve to carry Chandler's burden of showing prejudice from the Northern District's jury selection procedures. Chandler has not demonstrated that a jury drawn from the Eastern Division would have been reasonably probable to render a different verdict, and so this claim must fail.

Since the Court believes that this District's jury selection plan is in accord with the Jury Selection and Service Act, it is compelled to reject claim III D 1 a. Even if Chandler's trial counsel had objected to the method by which this District selects juries, that objection would have been rejected. Further, Chandler has not demonstrated prejudice from counsel's failure to object. Claim III D 1 a is thus due to be denied.

*b. Failure to make Batson challenges*

Chandler next argues that his trial counsel was ineffective because he failed to make *Batson* challenges to the government's use of some of its peremptory strikes to remove black potential jurors. According to Chandler, his trial counsel's decision not to make such challenges was based on counsel's mistaken view that only a black defendant could invoke *Batson.*[8]

Chandler's counsel, however, did raise this issue in his motion for a new trial on April 8, 1991. However, the Court denied that motion by Order dated May 30, 1991, on two alternative grounds. First, the Court held that Chandler's trial counsel had waived any *Batson* challenges by failing to raise them during jury selection. Second, the Court found that there was no evidence that the government's strikes were racially motivated. The Court observed in its May 30, 1991 Order that the government's explanations for its strikes, coupled with the fact that the government did not challenge two blacks who were actually seated as jurors (despite leaving some peremptory strikes unused), showed an absence of racial motivation for the strikes.[9] The Eleventh Circuit affirmed on the first ground, finding that Chandler's

---

7. According to the 1990 Census, 19.56% of the population of the Eastern Division is black, compared with 18.31% of the District as a whole. The master jury wheel of persons from the Eastern Division is 16.91% black, compared with 16.85% for the District as a whole. The qualified jury wheel figures are 14.74% black for the Eastern Division, and 13.59% for the District. *See United States v. Grisham,* 841 F.Supp. 1138, 1149 n. 23 (N.D.Ala.1994), *aff'd,* 63 F.3d 1074 (11th Cir.1995).

8. Chandler's trial was commenced just before the Supreme Court's decision in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

9. The seated jury essentially mirrored the qualified jury wheel for the District as a whole, as well as the Eastern Division.

trial counsel waived the *Batson* challenges by failing to object in a timely fashion.

■ However, the Court is convinced that Chandler cannot show prejudice from his trial counsel's failure to make *Batson* challenges. As the Court noted in its May 30, 1991 Order, the government's use of strikes did not show racial discrimination. Chandler's potential *Batson* claims were without merit, and so his trial counsel's failure to make them cannot serve as the basis for a claim of ineffective assistance. Claim III D 1 b is due to be denied.

*c. Failure to discover pro-death penalty jurors during voir dire and move to strike them for cause*

Chandler's next claim of ineffective assistance is that his trial counsel failed to conduct the kind of searching voir dire inquiry necessary to discover jurors whose views are so in favor of the death penalty that they would be unable to follow the Court's instructions regarding the weighing of aggravating and mitigating factors, as required by § 848(k). *See Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). According to Chandler, if his trial counsel had conducted a more thorough voir dire, he would have discovered jurors disqualified from service under *Morgan.*

■ This claim fails for two reasons. First, Chandler alleges no facts that entitle him to relief. Although Chandler's § 2255 motion states that "[i]t is the belief of the defense" that some members of Chandler's jury should have been discovered and excluded under *Morgan,* Chandler pleads no specific facts on this point. Chandler's claim that there were pro-death penalty jurors in this case that were unable to follow the weighing instructions required by § 848(k) is founded on sheer speculation.

In addition, the voir dire record shows that each of the potential jurors was interrogated about his or her feelings with regard to the death penalty, and, more importantly, whether those feelings would interfere with that juror's weighing of aggravating and mitigating factors in deciding whether to impose the death penalty. Each of the twelve jurors who sat on Chandler's case was asked by the Court about these matters, and each responded that he or she could fairly weigh the evidence and could be persuaded to either vote for or against the death penalty, based upon the evidence presented.[10] The Court has no idea what Chandler's trial counsel could have asked in addition to the Court's voir dire to discover lurking pro-death penalty jurors; counsel actually requested four strikes for cause (two because of perceived attitudes in favor of the death penalty), and used peremptory challenges to remove jurors that the Court refused to strike for cause. Chandler has certainly not provided any specific interrogation that his trial counsel should have engaged in, and has pointed to no evidence that any of the jurors lied to the Court in answering voir dire questions. In sum, the record indicates that the twelve jurors who sat on Chandler's case were fully able to weigh the aggravating and mitigating evidence and reach a verdict in the manner prescribed by the Court's instructions and § 848(k). Because each juror's views regarding the death penalty were fully explored by the Court in voir dire, Chandler's trial counsel was not inadequate for failing to repeat that inquiry. Claim III D 1 c is due to be denied.

---

10. *See* Tr. 1–150 to –152 (juror Chandler—no strong feelings one way or the other about the death penalty); 1–167 to –174 (Usher—could vote "either way" with respect to the death penalty); 1–180 to –183 (Aycock—feelings with respect to the death penalty would "depend on the circumstances"); 1–184 to –187 (Fochtmann—no strong feelings one way or the other about the death penalty); 1–206 to –209 (Cochran—could vote either way on the death penalty, and would have to listen to the evidence before deciding); 1–235 to –239 (Lovill—no strong feelings; would only vote to impose the death penalty if the circumstances warranted it); 1–239 to –243 (La-

them—no strong feelings about the death penalty); 1–296 to –299 (Allen—described herself as "right in the middle" with respect to the death penalty and assured the Court that she would fairly take the mitigating evidence into account); 1–300 to –303 (Muglach—"definitely" could consider either imposing or not imposing the death penalty); 2–2 to –7 (Holland—could vote to either recommend or not recommend the death penalty); 2–11 to –16 (Williams—no strong feelings, or even a leaning, one way or the other about the death penalty); 2–20 to –24 (Strong—"positive" that she could fairly weigh the evidence regardless of any personal feelings).

### III D 2: Ineffectiveness during the guilt/innocence phase of trial

Chandler asserts numerous actions or inactions of his trial counsel that he claims amounted to ineffective assistance. The Court will address each in turn, mindful of Chandler's burden of showing both objectively unreasonable conduct on his counsel's part *and* prejudice as a result of that conduct.

*a. Failure to conduct an adequate pre-trial investigation*

Here, Chandler asserts, in general terms, that his trial counsel failed to adequately investigate the case before trial. The Court does not view this claim as freestanding; Chandler asserts specific instances of his counsel's lack of pre-trial preparation in the claims that follow. The Court will address Chandler's specific arguments about his counsel's lack of preparation in that context. Standing alone, claim III D 2 a is simply a conclusory statement that Chandler's counsel was unprepared and that Chandler was prejudiced as a result. As a § 2255 petitioner, Chandler has the burden to plead specific facts entitling him to relief; conclusory allegations will not even warrant an evidentiary hearing. *See Spinkellink v. Wainwright,* 578 F.2d 582, 614 n. 40 (5th Cir.1978). *See also Harris v. Johnson,* 81 F.3d 535, 540 (5th Cir.1996); *Daniels v. United States,* 54 F.3d 290, 293 (7th Cir. 1995). Here, Chandler has failed to allege facts showing either professionally deficient performance or prejudice, and so the Court will deny claim III D 2 a.[11]

*b. Failure to investigate and present evidence regarding Marlin Shuler's abuse*

Chandler claims that his trial counsel could easily have procured numerous witnesses,[12] each of whom could have testified about horrible incidents of abuse committed by Marlin Shuler against Donna Shuler and others in Charles Ray Jarrell's family. This evidence, according to Chandler, should have been discovered by his trial counsel and presented in furtherance of the argument that Charles Ray Jarrell killed Marlin Shuler on his own, without any inducement from Chandler.

The government points out that Chandler's trial counsel did introduce evidence of Marlin Shuler's abuse and Charles Ray's resentment of that abuse at trial, in the form of testimony from both Charles Ray and Billy Jo Jarrell. At trial, both testified about Marlin Shuler's conduct; Billy Jo recited some particularly violent episodes (such as Marlin Shuler driving Donna Shuler off a cliff, or beating her so badly that she required stitches in her head). (Tr. 8–153 to – 154). And, more importantly, Chandler's trial counsel elicited the testimony of Charles Ray himself on this subject, culminating in Charles Ray's testimony that he had previously attempted to shoot Shuler point-blank in the face with a pistol after an incident of abuse. (Tr. 8–109 to –112). Charles Ray testified that he had intended to kill Shuler at that time, but failed to do so only because his pistol misfired. (Tr. 8–112). Chandler's counsel emphasized this testimony in his closing argument. (Tr. 10–135 to –136).

Viewed in light of the coverage of this issue at trial, the Court is forced to conclude that Chandler cannot show prejudice from his trial counsel's failure to introduce further evidence of Shuler's abuse. The jury already heard from Charles Ray Jarrell himself testimony that Shuler's abuse had driven him to a previous attempt to kill Shuler; this evidence was the strongest possible indication that Charles Ray Jarrell had an alternative motive to kill Shuler. Chandler's counsel presented this testimony and argued its import to the jury, but the jury rejected it. The additional evidence Chandler's counsel could have introduced would have been far less probative of Charles Ray Jarrell's motive to

---

11. Chandler's trial counsel testified that he and his paralegal interviewed 67 witnesses prior to trial. This testimony strongly suggests that, in a general sense, counsel did not fail to perform an adequate pre-trial investigation.

12. Chandler's claim here that evidence regarding Shuler's abuse was "readily available" to his trial counsel is flatly inconsistent with his claim that evidence of Shuler's abuse is "newly discovered." *See* claim III C 9. It is also inconsistent with his claim that the government "suppressed" information regarding Marlin Shuler's abuse in violation of *Brady. See* claim III B 2 a.

kill Shuler than the testimony of the killer himself, and so the Court must conclude that there is no reasonable probability that this evidence would have resulted in a different result at trial. Claim III D 2 b is due to be denied.

*c. Failure to interview Donna Shuler and move for a continuance when she became unavailable to testify*

This claim is identical to claim III D 2 b. Donna Shuler could have testified at trial about Marlin Shuler's abuse of her, but became a fugitive (and, hence, unavailable to testify) shortly before Chandler's trial. Chandler now claims that it was ineffective assistance for his counsel to fail to interview Donna Shuler before she fled, and also argues that counsel should have moved for a continuance when Donna Shuler became unavailable.

The threshold flaw in this claim is that its materiality is tied to the value of additional evidence of Shuler's abuse. The Court has just concluded that additional such evidence would not have been reasonably probable to change the result of Chandler's trial, and so the Court rejects claim III D 2 c.

*d. Failure to move to suppress the Calvin Klein jeans advertisement*

At trial, the government introduced (through witness Tim Whatley) a Calvin Klein jeans label or advertisement that had some hand-written notes and doodling on it. (Tr. 8–36 to –37; Govt's Ex. 85). The Calvin Klein ad bore the words "Bill Broome," "lawyer Hubert," "copy of police report," "$17.00," "Cox," "Alma Turner," "8:00," "David," and "Judge Hughes." This document was seized during a September 1990 search of Chandler's home, pursuant to a warrant issued September 21, 1990 by Magistrate Judge Armstrong. The government offered it because it interpreted the words "Bill Broome" and "copy of police report" as being notes taken by Chandler when Donna Shuler called Chandler to tell him that Marlin Shuler had informed on her; Bill Broome had supplied Donna Shuler with a copy of the police report and an affidavit executed by Ricky Doyal. (Tr. 10–168). This evidence supported the government's theory that Chandler had ordered Marlin Shuler killed in retaliation for his act of informing on Donna Shuler, who sold marijuana for Chandler.

Chandler contends that the seizure of the Calvin Klein ad was outside of the scope of the warrant, and so violated the Fourth Amendment. Chandler further argues that his counsel should have ascertained this fact and moved to suppress the Calvin Klein ad. The government responds by arguing that (1) the seizure was not in violation of the Fourth Amendment; (2) even if the search was unreasonable, the officers conducting the search did so in good faith reliance on the warrant, and so suppression would have been inappropriate; and (3) the Calvin Klein advertisement was weak evidence that was eclipsed by the much more damaging testimony of Raymond Pointer, Charles Ray Jarrell, Billy Jo Jarrell, and others, each of which linked Chandler directly to the Shuler murder.

The Court agrees that Chandler cannot show prejudice from his counsel's alleged failure to attempt suppression of the Calvin Klein ad. As the government notes, the Calvin Klein ad is extremely weak evidence that, at most, only implies that Chandler was aware that Marlin Shuler had informed on Donna Shuler. By contrast, the testimony presented by the government showed that Chandler was aware that Marlin Shuler had gone to the police *and* expressed an intent to kill Shuler as a result. *See, e.g.,* Tr. 4–77 to –78 (Raymond Pointer). So, the Court concludes that there is no reasonable probability that the result of Chandler's trial would have been different, even absent the Calvin Klein ad. Because Chandler cannot show prejudice from his trial counsel's alleged error, claim III B 2·d is due to be denied.

*e. Failure to challenge the government's attribution of the Calvin Klein ad to defendant*

Chandler's next argument also revolves around the Calvin Klein ad (Govt's Ex. 85). Here, Chandler takes the position that, as a matter of fact, the handwriting on the Calvin Klein ad was that of Deborah Chandler (defendant's wife). Further, Chandler takes the position that Mrs. Chandler's notes related to an incident in which defendant's son was

arrested some two years before the arrest of Donna Shuler. Chandler's argument is that his trial counsel should have investigated the handwriting on the Calvin Klein ad and presented evidence of its true origin and meaning. The Court held an evidentiary hearing on this point on October 31 and November 1 and 3, 1996.

■ The Court will assume that Chandler has proven that the handwriting on the Calvin Klein ad was not his and will accept, for the purpose of deciding this claim, Chandler's argument that the writing on the Calvin Klein ad had nothing to do with Donna Shuler's arrest. However, the record does not support Chandler's claim of ineffective assistance. To begin with, as the Court has just noted, the Calvin Klein ad is extremely weak evidence. Although it says "Bill Broome" and "copy of police report," it also contains many other words that obviously have nothing to do with Donna Shuler's arrest.[13] True, the prosecution argued that it showed knowledge on Chandler's part of Marlin Shuler's visits to the Piedmont Police station, but the Court instructed the jury that the lawyers' arguments were not evidence. (Tr. 10–87). The weakness of the Calvin Klein ad, together with the fact that the government introduced testimony that directly established Chandler's motivation to kill Shuler, shows that the Calvin Klein ad was not material to the jury's decision. It follows that Chandler cannot demonstrate any reasonable probability of a different result at trial, even if his trial counsel had thoroughly discredited the Calvin Klein ad. Claim III D 2 e is due to be denied.

*f. Failure to request a jury instruction that Count III required a connection between the continuing criminal enterprise and the murder*

■ Chandler next argues that his trial counsel should have requested that this

Court instruct the jury that, in order to convict Chandler under Count III, it must find beyond a reasonable doubt that the murder of Marlin Shuler was connected to or in furtherance of the continuing criminal enterprise alleged in Count II. Chandler asserts that the Court's instructions, which were drawn from the language of § 848, allowed the jury to convict Chandler for a murder committed around the same time as he was engaged in a continuing criminal enterprise. According to Chandler, he suffered prejudice from this lack of instruction because there was an alternative motivation for Chandler to have requested Shuler's murder (Shuler's abuse of family members).

The Court rejects this claim. On the direct appeal of Chandler's conviction, Chandler's counsel argued, as plain error, this Court's instructions to the jury on this point. The Eleventh Circuit affirmed and commented as follows:

> [t]here is no reasonable likelihood that the jury believed that it could find Chandler guilty even if it found that he solicited Shuler's murder for reasons not connected to the continuing criminal enterprise. The instructions clearly conveyed to the jury that it must find a connection between Shuler's murder and the enterprise.

*United States v. Chandler,* 996 F.2d 1073, 1098 (11th Cir.1993). Because Chandler must show a reasonable probability that the result of his trial would have been different absent his trial counsel's alleged error, the Eleventh Circuit's holding, which expresses this Court's independent views, nullifies this claim of ineffective assistance. Claim III D 2 f is due to be denied.

*g. Eliciting damaging testimony from Charles Ray and Billy Jo Jarrell*

Chandler argues that his trial counsel's conduct of the trial fell below professionally

---

**13.** Drew Redden, Chandler's trial counsel, testified that he had no idea what the ad's significance was until the government's closing argument. He also testified that he discussed the ad with Deborah Chandler, who did not know what it related to or whom had written it. This evidence supports the Court's conclusion that the ad itself was of little or no probative value. Chandler faults his trial counsel for not realizing the importance of the ad before closing arguments, but an inspection of the advertisement itself fails to disclose any relevance it might have to the case, and counsel inquired about the ad to Mrs. Chandler. It is ludicrous to suggest that counsel was constitutionally inadequate for failing to divine the government's intentions regarding the advertisement and prepare accordingly.

acceptable standards and prejudiced the result of the trial when he questioned Charles Ray and Billy Jo Jarrell. The government's response is simply to point out that the "damaging" testimony of Charles Ray and Billy Jo was largely repetitive of testimony that had been adduced by the government during its case in chief. Hence, argues the government, there was no prejudice to Chandler.

■ The testimony elicited by Chandler's trial counsel from Charles Ray Jarrell, upon reading, seems wholly exculpatory to Chandler. Charles Ray detailed the previous incident in which he had attempted to kill Shuler because of Shuler's abusiveness. (Tr. 8–109 to –112). This evidence was not "damaging" to Chandler, as far as the Court can tell, and Chandler has not noted any specifics about why Charles Ray's testimony was damaging. Against this backdrop, the Court cannot conclude that Chandler suffered any prejudice from his trial counsel's decision to interrogate Charles Ray Jarrell.

■ The most damaging portion of Billy Jo Jarrell's testimony recited an incident in which Billy Jo had overheard Chandler offer Charles Ray $5,000 for Shuler's murder. (Tr. 8–137 to –138). However, this evidence cannot rise to the level of prejudice required for an ineffective assistance claim, because it was merely repetitive of evidence the government had already presented, particularly that of Raymond Pointer. In addition, Chandler's trial counsel apparently called Billy Jo to the stand to examine him about various inconsistencies in statements he and Charles Ray had given to the police.[14] *See* Tr. 8–137 to – 142. Counsel also explored both Charles Ray's and Billy Jo's deals with law enforcement personnel that induced their testimony. (Tr. 8–115 to –118, 8–136). In addition, Billy Jo testified that Charles Ray was an alcoholic

whose memory of Shuler's killing was highly questionable, due both to drinking and a subsequent incident in which Charles Ray suffered some possible brain damage when he was bitten by a rattlesnake. (Tr. 8–142 to –143). Chandler's counsel obviously made the decision that eliciting this information to undermine confidence in Charles Ray's testimony outweighed any danger of eliciting cumulative damaging testimony. In light of all the circumstances at the time, the Court cannot conclude that counsel's decision fell below reasonable professional standards.

Because Chandler has failed to show either unprofessional errors or prejudice, claim III D 2 g is due to be denied.

*h. Failure to investigate and discredit Raymond Pointer*

Here, Chandler argues that his trial counsel was deficient for failing to discover that Raymond Pointer is a habitual liar. Chandler asserts that this information was readily available,[15] and would have severely undermined the credibility of Pointer's testimony.

At trial, Pointer testified that he had regularly purchased marijuana from Donna Shuler, had observed marijuana transactions between Donna Shuler and Chandler, and had made several marijuana runs to Anniston for Chandler. (Tr. 4–63 to –74). Pointer also related an incident in which he said that Chandler had offered him $5,000 to kill Marlin Shuler, and had also asked him to kill Ricky Doyal (Chief of the Piedmont Police Department) and Kathy Jarrell. (Tr. 4–75 to –80).

Chandler argues that his trial counsel should have discovered Pointer's habitual lying through pretrial investigation. In addition, Chandler argues that counsel should have known about Pointer's lack of veracity because of inconsistencies in Pointer's statements to the police and because Pointer was

---

**14.** Specifically, Billy Jo's testimony about the $5,000 offer was elicited because Billy Jo had told police on September 20, 1990 that Charles Ray had actually received the $5,000 from Chandler after killing Shuler, and that Charles Ray had "*bought several vehicles*" with the money. *See* Government's Exhibit 1 to the 11/95 hearing, document 6D. However, Charles Ray testified that Chandler never paid him the $500 that he had been promised for killing Shuler. Tr. 4–12.

**15.** This claim that the information regarding Raymond Pointer could have been easily discovered by trial counsel is inconsistent with Chandler's assertion elsewhere that the Raymond Pointer information is "newly discovered evidence." *See* section III C 4.

actually interviewed by trial counsel and gave counsel a statement precisely contradicting his trial testimony. According to Chandler, these facts should have led his counsel to investigate Pointer's background more thoroughly and discover the true facts.

■ The Court held an evidentiary hearing on this claim on October 31, November 1, and November 3, 1995, and now concludes that Chandler has failed to prove that his trial counsel was inadequate in this respect.

Chandler's arguments that his trial counsel should have more thoroughly investigated Pointer's background are all unpersuasive. Although Chandler presented the testimony of a number of witnesses that all tended to show Pointer's tendency to lie, each of those witnesses also testified that Pointer's lying is never revealed by his demeanor—only persons who had known Pointer for some length of time would have reason to suspect that he was being untruthful. (11/95 Tr. 450–51, 474). In essence, Chandler's witnesses proved too much—that Pointer was not simply a habitual liar, but was also skilled at lying in a convincing manner. This evidence negates any assertion that Chandler's trial counsel should have been alerted to the fact that Pointer was lying. Chandler's trial counsel himself testified that he had no reason to believe that Pointer suffered from any mental problems. (11/95 Tr. 405).

Chandler's argument that inconsistencies in Pointer's statements to police should have induced his trial counsel to investigate is also without merit. In statements to police, Pointer apparently said that Chandler had offered him $5,000 to kill Kathy Jarrell, and then retracted that statement (it was crossed out in the notes of the interview). See Government's Exhibit 1 to the 11/95 hearing, Doc. 10B. During grand jury proceedings, Pointer changed his story to testify that Chandler had indeed solicited him to murder Kathy Jarrell. Id., Doc. 10C, at 5. However, Pointer's testimony regarding the bulk of his conversation with Chandler remained constant—Pointer told the police and the grand jury that Chandler had offered him $5,000 to kill Marlin Shuler and $10,000 to kill Ricky Doyal. The minor inconsistency regarding Kathy Jarrell is not so great that

it should have alerted trial counsel to the fact that Pointer had mental problems that caused him to lie impulsively.

Trial counsel also interviewed Pointer before trial, at which time Pointer stated that Chandler had never made any offers of money to kill anyone, but that Donna Shuler had offered him $100 to "run off" Marlin Shuler. (11/95 Tr. 349). At trial, Pointer reversed his story yet again, testifying again that Chandler had made the offers of money for the murders of Shuler and Doyal. (Tr. 4–75 to –80). Chandler argues that these changing accounts of the conversations between Pointer and Chandler should have prompted a more thorough investigation of Pointer's background.

The Court does not agree. Pointer could have given inconsistent accounts of his conversation with Chandler for many reasons; it does not follow that counsel should have suspected some mental problem simply because Pointer had told police one account and counsel another. Chandler's § 2255 counsel have discovered Pointer's reputation for truthfulness because they were given essentially unlimited time and financial resources to interview every witness even remotely related to the case. Chandler's trial counsel had considerably less freedom to conduct this kind of far-ranging investigation, and the Court cannot conclude that counsel was constitutionally inadequate for failing to suspect that Pointer had a mental problem. See Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir.1995) (commenting on "the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel"). Pointer's changing testimony is simply inadequate, without more, to support the inference that a minimally adequate counsel should have been spurred into conducting a more thorough investigation. Viewing trial counsel's actions in light of the circumstances at the time of trial, the Court concludes that Chandler has failed to demonstrate such unprofessional errors that would rise to the level of ineffective assistance.

Finally, trial counsel introduced evidence that Pointer's statement to the police was a lie. According to the testimony of Jack Pointer, Raymond had heard some news coverage indicating that Chandler was implicated in the Shuler murder, and Raymond admitted that his statement about Chandler offering money for the murders of Shuler and Doyal was a lie. (Tr. 9–55 to –56, 66, 70). According to Jack's testimony, Raymond told Jack that it was actually Donna Shuler who had offered Raymond Pointer money to "run off" Marlin Shuler. (Tr. 9–67).

So, the trial transcript reveals that the information about Raymond Pointer's fabrication of his testimony about Chandler and Pointer's prior inconsistent statements about the Shuler murder was presented to the jury. The Court does not understand how further testimony impeaching Pointer would have been reasonably probable to cause the jury to reach a different conclusion. Because Chandler has failed to show either objectively unprofessional conduct by this trial counsel or prejudice as a result, claim III D 2 h is thus due to be denied.

*i. Ineffectiveness due to a conflict of interest arising from Pointer's charges of coercion*

At Chandler's trial, Pointer explained his prior inconsistent statement to Chandler's trial counsel by testifying that he had been coerced into giving that statement to Chandler's trial counsel. (Tr. 4–104 to –107, 110). Because counsel was the only witness to the prior inconsistent statement, Chandler argues that counsel was placed in the position of having to avoid calling himself as a witness to refute Pointer's testimony. In addition, Chandler argues that Pointer's charge of coercion put trial counsel on the defensive, thereby limiting his impeachment of Pointer while counsel attempted to disprove Pointer's allegation of coercion.

The record does not bear out Chandler's argument. Regarding Chandler's first contention, that counsel was placed in the awkward position of potentially having to call himself as a witness, the trial transcript reveals that no conflict actually arose. If Pointer had denied making the prior inconsistent statement, counsel might have been placed in such a position, but Pointer readily admitted to making that statement. (Tr. 4–96). *See also* Tr. 9–55 to –56 (testimony of Jack Pointer). Hence, there was no need for counsel to even consider calling himself as a witness to prove that the prior inconsistent statement had been made.

In addition, Pointer's charges of coercion were directed at Chandler himself, not at trial counsel. Pointer never suggested any wrongdoing on counsel's part, but did testify that members of Chandler's family had intimidated him just prior to his interview with trial counsel. (Tr. 4–109 to –110). Chandler's assertion that counsel was placed in a conflict of interest situation is simply not supported by the record—there was no reason for counsel to defend himself against Pointer's charges of coercion. Although the impeachment value of Pointer's prior inconsistent statement was undermined by Pointer's testimony regarding coercion, this was not the fault of trial counsel or any conflict of interest between Chandler and counsel. Counsel did everything he could to impeach Pointer's testimony, and established that the prior inconsistent statement was made. However, Pointer was prepared to explain that prior statement, and counsel could not have prevented that explanation.

Because the record demonstrates that no conflict of interest arose between Chandler and counsel at trial, claim III D 2 i is due to be denied.

*j. Failure to investigate and impeach the testimony of Toby Barnwell*

Toby Barnwell testified at trial about an incident wherein Chandler announced at a Piedmont Huddle House restaurant, in the presence of Toby Barnwell, "Junior" Shell, and Joe Barnwell, that Patrick Burroughs was dead and that Jeff McFry would be next. (Tr. 4–151 to –52). Chandler has now proffered the testimony of Joe Barnwell and Junior Shell to the effect that they were present during this conversation, but that Chandler never said anything about Burroughs or McFry. Chandler argues that his counsel was ineffective for failing to interview these witnesses to the conversation and

present this evidence at trial. The government's response is that Chandler cannot show prejudice from this failure.

■ The Court agrees that Chandler cannot show prejudice here. The testimony of "Junior" Shell and Joe Barnwell, at best, would have completely neutralized Toby Barnwell's testimony as Rule 404(b) evidence of Chandler's intent to kill Shuler. However, the jury would still have been left with nearly identical testimony from both Charles Ray Jarrell, see Tr. 3–231, and Melissa McFry, see Tr. 4–137. In addition, it is important to note that Chandler was convicted of the Shuler murder and was *not* charged with killing Burroughs or McFry. Given the limited role of the Burroughs/McFry evidence under Rule 404(b) and the fact that the government presented identical testimony from other witnesses, the Court concludes that there is no reasonable probability that the result of Chandler's trial would have been different if Toby Barnwell's testimony had been rebutted. Claim III D 2 j is due to be denied.

### k. Failure to attack the "Daily Prayer"

At trial, the government introduced as evidence a book containing Chandler's records of his marijuana business, which was recovered from Chandler's vehicle during a search. (Govt's Ex. 13). The last page in the book contained a "daily prayer" that read, in part, "help me to keep my eyes and ears open, my mouth shut, and my nose out of other people's business." The government argued at trial that this "daily prayer" in Chandler's marijuana book suggested Chandler's disdain for informants (like Marlin Shuler), thus supporting the government's theory that Chandler had ordered Shuler killed in retaliation for Shuler's statements to the Piedmont Police. (Tr. 10–171).

Chandler now takes the position that the handwritten daily prayer was actually written by Chandler's daughter, not Chandler, and that trial counsel was ineffective for fail-

ing to present evidence (e.g., handwriting analysis) to this effect. The government argues that there was no material prejudice to Chandler as a result of counsel's omission, because the presence of the prayer in the marijuana book would have reflected Chandler's mentality regardless of whom had actually penned it. In addition, the government argues that, although a handwriting analysis of the "daily prayer" might have indicated that Chandler did not write the prayer, it would have confirmed that the numerous marijuana-related entries in the book were written by Chandler, thereby inculpating him with respect to Counts I and II.

■ This claim was one subject of the October/November 1995 evidentiary hearing held by the Court, and the Court finds that Chandler has failed to prove his claim of ineffective assistance. Even if trial counsel had introduced a handwriting analysis of the prayer, the government could have used its presence in the marijuana records as an indication of Chandler's disposition. The Court also agrees that a handwriting analysis of the prayer might have inculpated Chandler in the marijuana transactions detailed in the book, even as it identified some other person as the writer of the prayer. In addition, because the prayer was such weak evidence of Chandler's motivation to kill Shuler (in contrast to the testimony of Charles Ray Jarrell, Billy Jo Jarrell, and Raymond Pointer), the Court cannot conclude that there is any reasonable probability that the result of Chandler's trial would have been different if the handwriting evidence had been presented. Claim III D 2 k is thus due to be denied.[16]

### l. Failure to challenge the amount involved in the Count I conspiracy

Chandler was convicted, under Count I, of conspiring to possess with intent to distribute more than 1000 kg of marijuana or 1000 marijuana plants. Chandler argues that,

---

**16.** In addition, Chandler's trial counsel testified at the November hearing that, as a tactical matter, he believed it would have been "very poor strategy" to introduce evidence that Chandler had not written the daily prayer, because of the danger that the remainder of the writing in the book would have been attributed to Chandler. Trial counsel's judgment on this matter is not controlling, but supports the Court's conclusion that Chandler suffered no prejudice from counsel's alleged omission.

even if the trier of fact believed every bit of evidence presented at trial, he only dealt with about 360 kg of marijuana, far short of the 1000 kg required for a conviction on Count I. Chandler further argues that his trial counsel was ineffective for failing to defend Count I on this basis.

■ Chandler's argument is refuted by the trial transcript. The government introduced a great deal of evidence regarding Chandler's marijuana operation—purchases of large amounts of fertilizer, Chandler's substantial assets, and Chandler's planting, plowing, surveillance, and harvesting of many thousands of marijuana plants.[17] In addition, the government introduced evidence of a number of runs to Texas directed toward the purchase of large amounts of marijuana,[18] as well as the incident in which Chandler was arrested in Conyers, Georgia in an attempt to purchase some 100 pounds of marijuana from Agent Skinner.[19] This was powerful evidence that Chandler's objective was to sell more than 1000 kg of marijuana *or* more than 1000 plants.

In addition, Chandler's legal reasoning misunderstands the nature of the charge in Count I. Count I alleged that Chandler *conspired* to distribute more than 1000 kg of marijuana or 1000 plants, not that he *actually succeeded* in doing so. Chandler's argument that he only succeeded in distributing 360 kg of marijuana does not refute the government's position that the goal was in excess of 1000 kg. Rather, as the government argues, all of the evidence presented at trial suggested a mammoth marijuana operation.

The Court does not understand what Chandler's trial counsel could have done to lessen the impact of this accumulated evidence, and Chandler suggests no specific course of action that counsel should have followed. Because the government's evidence on this point was so strong, and because Chandler's legal argument about being responsible for only 360 kg of marijuana has so little exculpatory value with respect to Count I, the Court concludes that Chandler suffered no prejudice from counsel's alleged omission. Claim III B 1 *l* is due to be denied.[20]

*m. Failure to challenge Agent Howell's observations regarding marijuana plot locations and the plot book*

At trial, Agent Jay Howell testified about the correlation between marijuana plots in a book attributed to Chandler and actual plots Howell observed in the field (aided by Charles Ray Jarrell). (Tr. 7–64 *et seq.*). Howell testified that there was a "rough correspondence" between the actual plots and the plots recorded in the book. (Tr. 7–79). Howell also testified that the book led him to plots containing a total of 504 plants, either living, dead, or already harvested. (*Id.*). Howell also testified that he was able to visit only 20 of the 110 locations listed in the book. (Tr. 7–79 to –80). Totaling up the book's listing of the plants at each of the 110 locations, Howell testified that the book contained location information for 5,083 plants. (Tr. 7–80 to –81).

■ Chandler raises three claims of ineffective assistance with respect to Howell's testimony. First, Chandler asserts that much of Howell's testimony concerned identifications of plots in the field as correlating with plots in the book by Charles Ray Jarrell, and so were inadmissible hearsay. Second, Chandler argues that trial counsel was ineffective for failing to challenge Howell's conclusion that there was a "rough correspondence" between the plots in the book

---

17. *See generally* testimony of Paul Watson, Charles Ray Jarrell, Perry McFry, Waylon Motes, Richard Fields, Johnny Lowe, Albert Lindsey, and Jay Howell.

18. *See* testimony of Charles Ray Jarrell.

19. *See* testimony of Patrick Skinner.

20. The Court also notes that Chandler's argument regarding his possession of only 360 kg of marijuana ignores the fact that possession of over 1,000 marijuana plants would have been adequate to support a conviction under Count I. The testimony of Paul Watson, *see* Tr. 3–109, Waylon Motes, *see* Tr. 4–179 to –84, and Jay Howell, *see* Tr. 7–80 to –81, all established that Chandler actually possessed far more than 1,000 marijuana plants, easily satisfying the requirement for conviction under Count I as charged.

and those in the field. Third, Chandler argues that his counsel was ineffective because he failed to correct Howell's testimony that he observed 504 plants; Chandler argues that Howell's observations showed 384 plants, not 504.

■ None of these claims can succeed in satisfying the prejudice prong of *Strickland.* The precise amounts of marijuana at each particular plot in the book was of trifling significance when compared to the other evidence of the size of Chandler's marijuana operation. Charles Ray Jarrell, Waylon Motes, and Paul Watson, for example, all testified about numerous marijuana growing and purchasing activities engaged in by Chandler. In addition, the correlation between the plots in the book and those in the field was of far less significance than the "bottom line" of Howell's testimony—the fact that the book contained locations for 5,083 plants. Given the volume of evidence presented at trial regarding the size of Chandler's marijuana operation, there is no reasonable probability that the result of Chandler's trial would have been different if Howell's testimony had been weakened somewhat by the actions Chandler suggests. Thus, claim III D 2 m is due to be denied.[21]

*n. Failure to defend Count II (continuing criminal enterprise)*

Chandler here reiterates his argument that there was insufficient evidence of the amounts of marijuana or money involved in the conspiracy, or that there was insufficient evidence of Chandler's leadership role in the enterprise, to sustain a conviction under Count II, the continuing criminal enterprise count. Chandler argues that trial counsel was inadequate for failing to more thoroughly defend Count II.

This argument fails for the reasons set forth with respect to the preceding two claims. The government introduced a great deal of evidence with respect to these issues, and Chandler identifies no specific course of action that counsel should have taken to successfully refute this evidence. Chandler's conclusory assertion that counsel could have obtained a different result at trial by more vigorously defending Count II is refuted by the trial transcript, and so claim III D 2 n is due to be denied.

*o. Failure to argue multiple conspiracies*

Chandler argues that the evidence at trial could have been interpreted by the jury to show either a single large conspiracy or several smaller conspiracies. Chandler asserts that his trial counsel was deficient for failing to argue that the evidence showed multiple conspiracies rather than a single, large one. Chandler asserts that he was prejudiced by counsel's failure to argue this point, because the jury could have found multiple, smaller conspiracies that would have involved amounts of marijuana insufficient to form the foundation for the capital conviction.

■ The government argues that Chandler was not prejudiced by the absence of argument on multiple conspiracies, because it presented overwhelming evidence of a single conspiracy involving Chandler. The Court agrees. Determining whether a case presents single or multiple conspiracies requires the Court to evaluate three criteria: "(1) the existence of a common goal, (2) the nature of the criminal scheme, and (3) the overlap of the participants in the various dealings of the conspiracy." *United States v. Taylor,* 17 F.3d 333, 337 (11th Cir.1994).

■ Here, the evidence presented at trial supported only a single conspiracy. The government presented evidence concerning Chandler's cultivation of many thousands of

**21.** Alternatively, with respect to the hearsay claim, the Court notes that Howell's testimony about Charles Ray Jarrell's help in correlating plots in the field with those in the book was not hearsay. As the Court noted in ruling on an earlier hearsay objection, (Tr. 7–63), it was entirely proper for the government to introduce the evidence of Charles Ray Jarrell's cooperation to lay the foundation for Howell's conclusions and opinions regarding the book and plots. Indeed,

Howell was certainly qualified to testify to those opinions as an expert in the drug trade, and the facts Howell relied upon to form his opinions were not required to be independently admissible. *See* Fed.R.Evid. 703. Any hearsay objection by trial counsel would have been obviously fruitless in light of the Court's earlier ruling, and so counsel's decision not to object again was not professionally unreasonable.

marijuana plants, as well as Chandler's attempts to purchase large amounts of marijuana for resale in Texas and Georgia. Chandler has made no specific argument about which evidence introduced at trial supported his claim of multiple conspiracies, and the Court is unaware of any. In short, most of the evidence presented at trial linked Chandler directly to the marijuana growing, buying, or selling activities he was convicted of. There was no evidence of any goal other than the selling of marijuana that might have supported the inference that there were different conspiracies with different goals. The Eleventh Circuit has held that a single conspiracy exists where one "key man" directs the illegal activities "while various combinations of other people exert individual efforts towards the common goal." *Taylor*, 17 F.3d at 337. Under these circumstances, the Court is confident that no reasonable jury could have found multiple conspiracies, and thus counsel was not deficient for failing to argue this issue. Claim III D 2 o is thus due to be denied.

*p. Failure to request an instruction on the lesser included offense of a conspiracy of less than 1000 kg or 1000 plants*

Chandler argues that trial counsel was ineffective for failing to request a jury charge on a lesser included conspiracy offense concerning less than 1000 kg of marijuana or fewer than 1000 marijuana plants. This claim fails for the same reason as the preceding four claims. The government presented overwhelming evidence that established amounts involved of well over 1000 kg or 1000 plants, and the jury found that this amount was involved beyond a reasonable doubt. The jury apparently believed that Chandler had engaged in a conspiracy of the requisite size, and the Court finds it difficult to understand why it can assume that the jury would have come to a different factual conclusion if it had been given the option of convicting Chandler of a conspiracy of less than 1000 kg or plants. Chandler has certainly provided no such reason, and so the Court concludes that Chandler has failed to show any prejudice from counsel's failure to request the instruction. Claim III D 2 p is thus due to be denied.

*q. Failure to defend Count IV*

Count IV charged Chandler with the use of a firearm in furtherance of his drug trafficking activities. The government's proof on this count consisted of the testimony of Raymond Pointer, who testified that Chandler had given him a gun in connection with some marijuana runs Pointer had made for Chandler to Anniston. (Tr. 4–68 to –74). Chandler argues that his trial counsel was deficient for failing to undermine the government's case on Count IV by attacking Pointer's credibility, as discussed with respect to claim III D 2 h *supra*.

The Court rejects this claim for the same reasons as set forth with respect to claim III D 2 h. Put simply, the evidence presented to the Court at the October/November 1995 hearing demonstrated that Chandler's trial counsel had no reason to suspect that Pointer was suffering from any mental problems. In addition, the testimony of Jack Pointer, presented by trial counsel, undermined Pointer's credibility. These two facts show that Chandler has failed to show either deficient performance or prejudice under *Strickland*. Claim III D 2 q is thus due to be denied.

*r. Failure to object to the Court's jury charge on the money laundering counts*

Chandler argues that this Court's instructions to the jury allowed him to be convicted twice for the same money laundering offense. Specifically, Chandler argues that the jury charge mistakenly identified the land involved in Count VII as that involved in Count VIII, and so the jury could have returned two verdicts with respect to Count VIII and no verdict at all on Count VII. Chandler asserts that his trial counsel was deficient for failing to object to the jury charge on Count VII.

This claim cannot avail Chandler, because it has already been rejected by the Eleventh Circuit. The Court of Appeals held that this Court's jury charge on Count VII "was not erroneous." *United States v. Chandler*, 996 F.2d at 1105. Since there was no error in the jury charge, Chandler cannot demonstrate that it was professionally unreasonable for his counsel to fail to make an

objection, and Chandler cannot show prejudice from the jury charge. Claim III D 2 r is thus due to be denied.

### III D 3: Ineffectiveness at the sentencing phase

#### a. Failure to present mitigation evidence

Chandler argues that his trial counsel failed to investigate the availability of mitigation evidence, and therefore failed to present character witnesses at the sentencing hearing. Chandler asserts that his counsel's failure to to do was ineffective assistance.

In a general sense, a claim of ineffective assistance for failure to present mitigation evidence is analyzed in the same manner as any other claim under *Strickland v. Washington*. However, the frequency of ineffective assistance claims arising from a failure to present mitigation evidence has given the Eleventh Circuit the opportunity to provide more detailed standards for evaluating such claims.

 The Eleventh Circuit has repeatedly held that defense counsel in a death penalty case has "a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *E.g., Baxter v. Thomas*, 45 F.3d 1501, 1513 (11th Cir.1995). The Eleventh Circuit has developed a special analysis for evaluating whether counsel's investigation was "reasonable": first, "it must be determined whether a reasonable investigation should have uncovered the mitigating evidence. [Second,] if so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel." *Id.* (citing cases). A reasonable tactical decision carries with it an extremely strong presumption of correctness that is well-nigh unassailable. *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir.1994). The Eleventh Circuit has firmly established that counsel can make a reasonable tactical decision not to investigate further into a defendant's background for mitigating evidence. *Bolender v. Singletary*, 16 F.3d 1547, 1557 n. 11 (11th Cir.1994). *See also Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) ("strategic

choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). In addition, counsel has no absolute duty to present available mitigating evidence, and the failure to do so is not *per se* ineffective assistance of counsel. *Id.* As the *en banc* court held in *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir.1995):

> The lesson to be drawn from our decisions is not that counsel's performance is always, or even usually, deficient if counsel fails to present available mitigating circumstance evidence. Nor is the lesson that the presentation of some mitigating circumstance evidence will always insulate counsel's performance from being condemned as ineffective. Instead, our decisions teach that whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances viewed through a lens shaped by the rules and presumptions set down in *Strickland* and its progeny.

*Id.* (citation omitted). However, counsel's mere invocation of the words "tactical decision" cannot insulate his conduct from scrutiny; "an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances." *Bolender*, 16 F.3d at 1558. *See also Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir.1995) ("our case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.1989) (counsel must make an "informed judgment" about whether to present mitigation evidence).

 If the Court finds that the failure to present mitigating evidence was not the result of a reasonable tactical decision, it proceeds to evaluate the prejudice prong of the *Strickland* inquiry. In death penalty cases, the test for prejudice is whether "there is a reasonable probability that absent the errors, the sentencer ... would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Bax-*

*ter*, 45 F.3d at 1513. In evaluating claims of prejudice from the failure to present mitigating evidence, the Eleventh Circuit has observed on occasion that evidence regarding a defendant's childhood "is entitled to little, if any, mitigating weight." *Bolender*, 16 F.3d at 1561. In each case, the Court of Appeals has balanced the aggravating evidence presented against the defendant with the proffered mitigating evidence, and has found prejudice in cases where the aggravating evidence was weak and the mitigating evidence was strong. *See, e.g., Baxter*, 45 F.3d at 1515; *Jackson*, 42 F.3d at 1369. On the other hand, where there has been strong aggravating evidence and "relatively unpersuasive" mitigating evidence, the Eleventh Circuit has found an absence of prejudice. *Buenoano v. Singletary*, 74 F.3d 1078, 1085 (11th Cir.1996).

Chandler's claim of ineffective assistance regarding mitigation evidence was a subject of the October/November 1995 evidentiary hearing conducted by the Court. Chandler presented the testimony of Drew Redden, Chandler's trial counsel, and also presented 27 character witnesses.

Chandler and the government vigorously contest the issue of why trial counsel did not present more mitigation evidence (in the form of character witnesses). Chandler argues that trial counsel failed to conduct an adequate investigation, and so Chandler concludes that any decision counsel made not to present character evidence was not reasonable. The government contends that trial counsel feared "opening the door" to cross-examination and rebuttal witnesses concerning Chandler's bad character, and so made a reasonable tactical decision not to present character evidence. However, because the Court believes that Chandler has not carried his burden of showing prejudice from the absence of character evidence, the Court will assume (without deciding) that trial counsel's performance was inadequate. *See Waters v. Thomas*, 46 F.3d 1506, 1510 (11th Cir.1995) ("[a] court may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied").

As noted above, Chandler has the burden of showing, by a preponderance of the evidence, that there is a "reasonable probability" that he would have received a non-death sentence if trial counsel had presented the character evidence introduced at the October/November 1995 hearing. Although the Court acknowledges that the prejudice question in this case is a close one, and that reasonable people could disagree about whether Chandler was prejudiced, the Court is persuaded that the mitigating evidence presented at the October/November 1995 hearing, when weighed against the aggravating evidence presented at trial, fails to carry Chandler's burden of showing a reasonable probability of a different result. In fact, the Court is convinced that there is no reasonable probability that the result of the sentencing hearing would have been different if the proffered evidence had been presented.

The Court begins this analysis by recalling the evidence that was presented against Chandler at trial. The government presented evidence (that the jury accepted) that Chandler was the leader of a mammoth marijuana growing and selling operation. The jury heard evidence that Chandler employed Charles Ray Jarrell, an alcoholic with no means of support but the money Chandler paid him, to help plant marijuana fields, guard those fields from theft, and make purchase runs to Texas. The jury also heard (and apparently believed) that, after Marlin Shuler reported Donna Shuler's drug-selling activities to the Piedmont Police, Chandler decided to kill Shuler in retaliation. The government established that Chandler sought out Charles Ray Jarrell, who already had an incentive to kill Shuler, and induced Jarrell to murder Shuler by promising $500 to Jarrell, although the $500 was never paid. The jury found, beyond a reasonable doubt, that Chandler had procured Shuler's murder to protect his immense drug operation.

So, the jury convicted Chandler of a particularly egregious crime—Chandler wanted Shuler dead because of Shuler's cooperation with the Piedmont Police, but, instead of killing Shuler personally, Chandler took advantage of Charles Ray Jarrell's dependence on Chandler and Jarrell's resentment of Shu-

ler and solicited Jarrell to kill Shuler. Chandler then assisted Jarrell in attempting to hide Shuler's body and automobile, so that evidence of Shuler's murder would not be discovered. Based on this evidence, the jury unanimously found the presence of two aggravating factors, and also unanimously concluded that Chandler should receive the death penalty.

At the October/November hearing, Chandler presented the testimony of 27 character witnesses. These witnesses each described Chandler as a thoughtful, kind, honest, hardworking person who had, on many occasions, helped people in need, including the witnesses themselves. At first glance, this character evidence might seem highly persuasive. However, several factors combine to severely undercut the mitigating value of this evidence.

First, many of the witnesses testified that they had come to know Chandler long before his illegal activities began, and had seen him less in the years preceding his arrest. Many witnesses knew Chandler through church, and all testified that Chandler regularly attended church services when he was younger.[22] However, most of the witnesses who had become acquainted with Chandler through church admitted that Chandler's church attendance had "slacked off" in the several years prior to 1990, and so they saw less of Chandler then.[23] From all of the church-related evidence presented, it was obvious that these witnesses' knowledge of Chandler dated back to a time prior to Chandler's illegal activities; the witnesses could not claim any great familiarity with Chandler in the years leading up to the Shuler murder. Because this good character evidence related to a time period that was separated from

Chandler's crimes, it was of little mitigating value.

Other witnesses who knew Chandler also admitted that their knowledge of Chandler was severely dated. See 11/95 Tr. 74–75 (Joseph Fortenberry: grew up with Chandler and worked with him in 1983–84); 111–16 (Elaine Freeman: got to know Chandler in high school, and the acts of kindness she attributed to Chandler occurred in 1975 and 1985); 122 (Don Matthews: worked for Chandler in 1986); 139 (Rita Sue Smith: knew Chandler from school, 25–30 years ago, and Chandler's acts of kindness occurred in the late 70's to mid–80's); 159 (Henry Lawler: acts of kindness occurred in 1982 and 1987); 167 (Kenneth Kelley: Chandler helped him in the mid–80's); 192 (R.M. Trammell: knew Chandler as a child and "never was around him that much" later); 212 (Billy Russell: worked with Chandler from 1980 to 1985, and Chandler's acts of kindness occurred in 1984); 274 (Thomas Montgomery: worked for Chandler in the late 70's). This evidence, like the testimony regarding Chandler's church participation, would have been of little value in mitigation of a crime that occurred years later.

Further evidence of many witnesses' lack of knowledge about Chandler's character was testimony that the witnesses were unaware that Chandler was growing and selling marijuana. See 11/95 Tr. 76 (Joseph Fortenberry: didn't know much about Chandler's activities in 1989–90); 107 (Kenneth Chasteen); 168 (Kenneth Kelley); 176 (Ruth Trammell); 183 (Tina Stokes); 195 (R.M. Trammell). However, the jury heard overwhelming evidence of Chandler's involvement in extensive drug trafficking activities, and concluded beyond a reasonable doubt that Chandler, in fact, bought, grew, and sold great quantities

---

**22.** Fourteen of the 27 character witnesses knew Chandler through church. See 11/95 Tr. 43 (Harbert McCord), 54 (Dale Heath), 82 (Ruby McFry), 91 (Jerry Masters), 99–100 (Kenneth Chasteen), 144 (Joy McCoy), 163 (Kenneth Kelley), 179 (Tina Stokes), 198 (Kenneth McCord), 216 (Hubert Masters), 224 (Deborah McFry), 233 (Sharon Kelley), 249 (Mary Dobbs), 261 (Lesha McBrayer).

**23.** See 11/95 Tr. 48 (Harbert McCord: Chandler was not attending Church regularly in 1989); 83–86 (Ruby McFry: Chandler sang in the

church youth choir, but was not attending church regularly by 1990); 94–95 (Jerry Masters: knew Chandler through church until about 1975, and they "grew apart" after that); 106–07 (Kenneth Chasteen: Chandler was not attending Church regularly in 1989–90); 144 (Joy McCoy: knew Chandler from 1975–81, and had seen him only twice since 1981); 167–68 (Kenneth Kelley: Chandler's church attendance "slacked off" after he stopped singing in the youth choir); 216 (Hubert Masters: got to know Chandler when Chandler was 15 years old).

of marijuana. Witnesses who were unaware of Chandler's marijuana operation would have shown themselves to be ignorant of Chandler's character, and so their testimony would have carried little or no mitigating weight.

Finally, all of the character witnesses presented at the evidentiary hearing showed a strong bias in favor of Chandler. The government asked each witness about several incidents: (1) Chandler's arrest in Georgia while attempting to purchase 100 pounds of marijuana; (2) Chandler's flight from GBI Agent Skinner and Chandler's attempt to turn Skinner's gun back on him during a scuffle;[24] and (3) Chandler's statement on a tape to a confidential informant that, if he were "set up" again, he would have to kill someone (Govt's Ex. 45). Almost every witness was asked whether, if he or she knew that these incidents actually occurred, these facts would change his or her opinion of Chandler. The responses were, with one exception, uniformly negative. *See* 11/95 Tr. 51–52, 80, 86–88, 96–97, 109, 119–20, 140–42, 150–51, 161–62, 169–70, 183–85, 196, 202–04, 213–14, 228–30, 237–39, 246, 254–56. These responses largely nullified the persuasive value of the character testimony presented; a witness's high opinion of Chandler would have been of little moment to the jury if the witness believed that drug dealing and violent crimes were irrelevant to a person's character.[25]

■ So, to summarize, the mitigation evidence that Chandler's trial counsel could have offered was of tenuous value. Most of the descriptions of Chandler's good character dated back to many years before Chandler's involvement in selling marijuana, and so

would have done little to counter the evidence of Chandler's more recent bad character introduced at trial. Many witnesses were ignorant of Chandler's drug dealing activities altogether, severely limiting the reliability of their testimony. Finally, the fact that almost all of the witnesses testified that their opinion of Chandler would remain fixed, even if they knew that he was a violent drug dealer, further undermined the value of the witnesses as barometers of Chandler's character.

Weighing this weak character evidence against the strong aggravating evidence that the jury accepted, the Court concludes that there is no reasonable probability that the jury would have recommended a non-death sentence if trial counsel had presented more character evidence. Claim III D 3 a is due to be denied.

*b. Failure to object to the Court's instruction that the jury should not be concerned with Chandler's alternative sentence*

Chandler's next argument is that his trial counsel was ineffective in failing to object to the Court's instruction to the jury that

> [i]n deciding what recommendation to make, you are not to be concerned with the question of what sentence the defendant might receive in the event you determine not to recommend a death sentence. That is a matter for me to decide in the event you conclude that a sentence of death should not be recommended.

(Tr. 12–85).

Chandler alleges that this jury instruction was erroneous under the standard later announced in *Simmons v. South Carolina*, 512 U.S. 154, 114 S:Ct. 2187, 129 L.Ed.2d 133

---

24. For Skinner's account of this incident, *see* Tr. 6–68 to –69.

25. The preceding four paragraphs summarize the weaknesses in the testimony of 23 of Chandler's 27 witnesses. Of the remaining four witnesses, two were Chandler's siblings. (11/95 Tr. 240 (Charles Thomas Chandler); 256 (Sharon Robertson)). This testimony cannot establish prejudice, since Chandler's mother and wife testified at the sentencing hearing, but the jury recommended death notwithstanding their testimony. Adding character evidence from other relatives would have been similarly fruitless.

The third remaining witness, Wendy Twilley, offered little in the way of mitigation evidence, because she was 14 years old in 1990. (11/95 Tr. 146). Her age certainly undermined the mitigation value of her testimony.

Finally, Kerry Chasteen was not cross-examined by the government regarding his knowledge of or reaction to Chandler's illegal activities. However, Kerry Chasteen's testimony of Chandler's good character would have been subject to thorough cross-examination regarding these points, and so its mitigation value is essentially the same as that of the other witnesses.

(1994), and that his trial counsel was ineffective for failing to object to it.

Chandler does not take the position that his trial counsel failed to *raise* the *Simmons* issue, since counsel actually submitted proposed jury instruction A–12, which read (in part) as follows:

> If you do not recommend the death penalty, the Court will impose a sentence of life imprisonment without possibility of release or some other sentence authorized by law.

The Court refused to give this instruction, and, at the time the jury was charged, the following discussion took place:

> MR. REDDEN: All right. Could I have an opportunity to with reference to requested instructions that I filed take a look at mine and see if there are others than fourteen and fifteen I want to except to the failure of the Court to give?
>
> THE COURT: As far as I'm concerned you have an exception to my failure to give each of your fifteen in the language that you suggested to me to give them. You have that anyway.
>
> MR. REDDEN: All right. All right. And, of course, a ground on each one of those would be that it represents a correct statement of the law not fully covered by the Court's oral instruction.
>
> THE COURT: And whatever other appropriate ground.

(Tr. 12–93 to –94).

This colloquy establishes that Chandler's trial counsel raised the *Simmons* issue adequately. Further evidence that underscores this conclusion is the Eleventh Circuit's treatment of this issue. On direct appeal, the Eleventh Circuit reviewed the *Simmons* issue [26] *de novo*, in contrast to the plain error review it used for grounds asserted for the first time on appeal. *See United States v. Chandler*, 996 F.2d at 1085–86.

Because Chandler's trial counsel proposed that the Court inform the jury that life imprisonment without parole was a possible alternative sentence to the death penalty, and objected to the Court's failure to give that proposed instruction, the Court concludes that trial counsel did properly raise the *Simmons* issue. Since the record negates the factual basis for claim III D 3 b, it is due to be denied.[27]

*c. Failure to request mitigating findings on the special verdict form*

Chandler argues, and the Eleventh Circuit has held,[28] that § 848(k) requires the jury to have the option of returning written findings regarding mitigating factors, in the same manner in which they return findings on aggravating factors. It is undisputed that Chandler's trial counsel did not raise this issue during trial, and the Eleventh Circuit reviewed it under a plain error analysis. *See Chandler*, 996 F.2d at 1086–88. Chandler now raises trial counsel's failure to request written mitigation findings as an instance of ineffective assistance.

The government argues, and the Court agrees, that this claim is foreclosed by the Eleventh Circuit's holding on this issue. In its plain error analysis, the Eleventh Circuit held that this Court had committed plain error in failing to permit the jurors to return written mitigating findings. *See Chandler*, 996 F.2d at 1086–87. However, as part of the third element of plain error analysis, the Eleventh Circuit analyzed whether Chandler had demonstrated prejudice, that is, "that the error affected the outcome of the proceedings before the district court." *Id.* at 1087. The court concluded that the failure to give jurors the option of returning written mitigation findings "did not affect the outcome of Chandler's sentencing hearing." *Id.* at 1088. The Eleventh Circuit noted that Chandler's mitigation evidence was largely composed of stipulations, which were identi-

---

26. *Simmons* was decided after the Eleventh Circuit's opinion in Chandler's direct appeal. The Court refers to this issue as "the *Simmons* issue" for convenience.

27. Chandler also raises the *Simmons* issue on the merits, arguing that *Simmons* was a retroactive change in the law that entitles him to raise it

anew in the context of a § 2255 proceeding. The Court will address the *Simmons* claim on the merits in the context of that claim, designated III F.

28. *See Chandler,* 996 F.2d at 1087.

fied as such to the jury, and that the jury was correctly instructed on the weighing of aggravating and mitigating factors. *Id.*

The "prejudice" element of a claim of ineffective assistance mirrors that used by the Eleventh Circuit in its plain error analysis. Chandler has failed to establish that there is any reasonable probability that the option of written mitigating findings could have resulted in a different sentence, and so claim III D 3 c is due to be denied.

*d. Failure to request a burden of proof instruction on unadjudicated crimes*

Chandler takes the position that the government introduced evidence implicating him in the apparent murders of Burroughs and McFry, and then used that evidence as part of its aggravation case. Chandler asserts that his trial counsel should have requested a jury instruction to the effect that the jury could only consider the Burroughs/McFry evidence if the government linked Chandler to those murders beyond a reasonable doubt.

The government argues that no separate burden of proof instruction was needed, because the Burroughs and McFry evidence was used to attempt to prove one of the government's aggravating factors, "substantial planning." (Tr. 12–68). The Court did instruct the jury that the government's aggravating factors had to be established beyond a reasonable doubt, (Tr. 12–79), and further reminded the jury that it was to consider only the evidence from the guilt phase "relevant to your inquiry into the murder of Marlin Shuler as charged in Count Three or relevant to your inquiry regarding the existence of aggravating and mitigating factors." (Tr. 12–78). Finally, the Court instructed the jury that "[y]ou may not consider any aggravating factor other than the three aggravating factors on which I have instructed you." (Tr. 12–81).

 The Court concludes that Chandler was not entitled to a separate jury instruction regarding the Burroughs and McFry evidence. The Court's instructions defined the relevant aggravating factors, told the jury to consider no other aggravating factors, and informed the jury repeatedly that it was the government's burden to prove the aggra-

vating factors beyond a reasonable doubt. An additional jury instruction regarding the Burroughs and McFry evidence would have added nothing to the charge actually given to the jury.

In addition, the Court notes that the jury apparently did not accept the Burroughs and McFry evidence. As noted above, the only mention of Burroughs and McFry in the government's closing argument was when Mr. Hubbard identified that evidence as relevant to "substantial planning." (Tr. 12–68). However, the jury found that the government had not established the "substantial planning" aggravator beyond a reasonable doubt, instead finding that Chandler intended that Shuler be killed and intentionally procured his murder and that the Shuler murder was procured by promise or payment of money. In other words, the jury rejected the aggravator linked to the Burroughs and McFry evidence and instead found aggravators that had nothing to do with Burroughs and McFry.

Given the Court's instructions to the jury and the jury's apparent rejection of the Burroughs and McFry evidence, the Court concludes that Chandler suffered no prejudice from counsel's failure to request a separate burden of proof instruction. Claim III D 3 d is thus due to be denied.

*e. Failure to object to the "sympathy" instruction*

As part of its instructions to the jury in the penalty phase of Chandler's trial, the Court instructed the jury as follows:

> In reaching your findings concerning the aggravating and mitigating factors in this case, the instructions I gave you prior to your deliberations at the guilt phase regarding determination of credibility issues applies equally here. In other words, you alone determine the credibility of the witnesses and the weight to give their testimony and the other evidence. Also in determining whether to recommend a death sentence, you must avoid any influence of passion, or prejudice or sympathy. Your deliberation and verdict should be based upon the evidence you have seen

and heard and the law on which I have instructed you.

(Tr. 12–85 to –86). Chandler asserts that the instruction against considering "any influence of passion, or prejudice or sympathy" was erroneous, because it prevented the jury from considering mercy in deciding whether to impose the death penalty. Chandler further asserts that his trial counsel was ineffective for failing to object to this instruction.

The Court concludes that the instruction in question was not improper. In *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Supreme Court addressed a similar claim based on a jury charge that instructed jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." *Id.* at 540, 107 S.Ct. at 838. The California Supreme Court had held that the instruction violated the constitution by prohibiting the jury's consideration of sympathy, as Chandler asks this Court to do. *Id.* The Supreme Court reversed.

The Court criticized the California Supreme Court's interpretation of the jury charge as "hypertechnical" and "untenable." *Id.* at 542, 107 S.Ct. at 840. The Court held that, viewed in context, the jury charge was simply an admonition to the jury to refrain from considering the influence of "extraneous emotional factors" unrelated to the aggravating and mitigating evidence. *Id.* at 542–43, 107 S.Ct. at 839–40. Thus, it held the jury instructions proper.

The charge given to Chandler's jury was a similar admonition against taking extraneous emotional factors into account. As part of the jury charge, the Court carefully instructed the jury on the process of weighing the aggravating and mitigating factors presented. Chandler has singled out the reference to "sympathy" in precisely the same "hypertechnical" manner described in *Brown;* viewed in the context of the surrounding material and the other items contained in the list of influences the jury was told to avoid (passion and prejudice), it is clear that the jury charge in this case passes muster under *Brown.* Because the jury charge was appropriate, Chandler suffered no prejudice from

his counsel's failure to object to it. Claim III D 3 e must be denied.

### III E: Ineffective Assistance on Direct Appeal

Chandler raises several claims of ineffective assistance of appellate counsel, since Chandler's conviction and sentence were affirmed on direct appeal. *See United States v. Chandler*, 996 F.2d 1073 (11th Cir.1993). To analyze these claims, the Court "is to examine the alleged trial errors to see if they contain sufficient merit that appellate counsel can be faulted for not having raised them." *Williams v. Weldon*, 826 F.2d 1018, 1022 (11th Cir.1987). *Accord Johnson v. Dugger*, 911 F.2d 440, 449 (11th Cir.1990); *Waldrop v. Thigpen*, 857 F.Supp. 872, 921 (N.D.Ala. 1994). With this standard in mind, the Court turns to Chandler's claims of ineffective assistance of appellate counsel.

*1. Failure to appeal on the multiple conspiracy issue*

Chandler asserts that his appellate counsel were deficient because they failed to argue on appeal this Court's refusal to give Chandler's proposed jury instruction # 6, which was a charge on multiple conspiracies. Chandler argues that this omission was professionally unreasonable and resulted in prejudice to him.

The government responds with two arguments. First, it notes that numerous issues were raised on appeal by Chandler's counsel; the multiple conspiracy argument was simply "winnowed out" as a weaker argument not as deserving of the precious space of an appellate brief. Second, the government argues that the multiple conspiracy argument was without merit, and Chandler would not have obtained a different result on appeal if it had been raised.

The Court concludes that Chandler suffered no prejudice from counsel's failure to raise the multiple conspiracy issue on appeal. As noted above with respect to claim III D 2 o, the evidence presented at trial would have supported only a single conspiracy, not multiple ones. No reasonable jury could have found otherwise, and so the Court of Appeals

would not have reversed on this basis. Claim III E 1 is due to be denied.

*2. Failure to appeal the "sympathy" jury charge*

As noted above, Chandler contends that this Court's instruction to the jury to avoid the influence of "passion, prejudice, or sympathy" was improper. Chandler's trial counsel did not object to the instruction, and Chandler makes a claim of ineffective assistance based on that omission. *See* claim III D 3 e. Chandler also argues that his appellate counsel was inadequate in failing to challenge the "sympathy" instruction on appeal, under the plain error doctrine.

In analyzing claim III D 3 e, the Court has already concluded that the "sympathy" instruction was proper under *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). If follows that Chandler suffered no prejudice from appellate counsel's failure to raise this issue on appeal. Claim III E 2 is without merit.

*3. Failure to raise the admission of the Burroughs/McFry evidence at the sentencing hearing, or raise the lack of a burden of proof instruction with respect to the Burroughs/McFry evidence*

Chandler argues that his appellate counsel should have raised on appeal the admission of the evidence implicating Chandler in the apparent murders of Patrick Burroughs and Jeff McFry. In addition (or in the alternative), Chandler argues that his appellate counsel should have appealed this Court's failure to give a separate burden of proof instruction with respect to the Burroughs/McFry evidence. Chandler argues that the admission of the evidence at sentencing and the lack of a burden of proof instruction allowed the jury to sentence him to death on the basis of unadjudicated crimes.

As an initial matter, the Court notes that appellate counsel did raise the issue of the admissibility of the Burroughs/McFry evidence at sentencing. *See United States v. Chandler,* 996 F.2d at 1090–91. The Eleventh Circuit rejected Chandler's argument, finding that the evidence was properly admitted at the sentencing phase. *Id.*

In addition, the Court has already concluded that Chandler suffered no prejudice from the absence of a separate burden of proof instruction. *See* claim III D 3 d. Chandler also suffered no prejudice from appellate counsel's failure to raise this issue, and so claim III E 3 is due to be denied.

*4. Failure to raise on appeal the lack of connection between the CCE and the murder in the jury instructions regarding Count III*

Chandler argues that this Court's instructions allowed the jury to convict him of committing a murder at the same time that he was engaged in a continuing criminal enterprise, instead of requiring that the murder have some connection (other than temporal) to the CCE. Chandler argues that this construction of § 848 allowed him to be convicted of a crime outside of Congress' power to legislate under the Commerce Clause. Chandler argues that his appellate counsel should have raised this issue on appeal.

The fatal flaw in this argument is that it ignores the fact that this issue was raised on appeal and rejected by the Court of Appeals. Chandler argued on appeal that this Court's instructions did not convey the requirement that the murder be connected to the CCE, and the Eleventh Circuit held as follows:

> [t]here is no reasonable likelihood that the jury believed that it could find Chandler guilty even if it found that he solicited Shuler's murder for reasons not connected to the continuing criminal enterprise. The instructions clearly conveyed to the jury that it must find a connection between Shuler's murder and the enterprise.

*United States v. Chandler,* 996 F.2d at 1098.

Although Chandler's argument here is slightly different from that raised on appeal, the Eleventh Circuit's holding is still controlling. On appeal, Chandler argued that the jury instruction did not comport with the meaning of § 848; here, he argues that it allowed him to be convicted of a crime outside of Congress' commerce clause power. However, the first step in both arguments is the same—Chandler's premise that the instructions did not require a connection between the CCE and the murder. Because

the Eleventh Circuit has rejected that premise, claim III E 4 must be denied.

### III F: Simmons v. South Carolina

Chandler's jury was instructed, at the penalty phase, that it should not be concerned with the alternate sentence Chandler would receive if it did not recommend the death penalty. (Tr. 12–85). Chandler argues that this instruction violated both § 848 and the Constitution, because the jury should have been informed that Chandler could receive life in prison without parole if the death penalty was not imposed.

As an initial matter, Chandler's argument that the instruction violated § 848 has been rejected by the Eleventh Circuit. See United States v. Chandler, 996 F.2d at 1085–86. This Court will not revisit that issue.

However, Chandler did not raise the constitutional issue on appeal, because the case he relies upon, Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), was not decided until after the Eleventh Circuit's decision in Chandler's appeal. Chandler argues that Simmons amounts to a change in the law that allows him to relitigate this issue in the context of a § 2255 proceeding.[29]

In Simmons, the defendant was convicted of capital murder for beating an elderly woman to death in her home. Id. at 156–57, 114 S.Ct. at 2190. He also plead guilty to first degree burglary and two counts of criminal sexual conduct in connection with two prior attacks on elderly women. Id. These guilty pleas made the defendant ineligible for parole under South Carolina law. Id.

At the defendant's capital sentencing hearing, the defense introduced mitigating evidence suggesting that the defendant's violence was the result of severe psychological

and sexual abuse suffered by the defendant as a child. Id. As the Supreme Court noted, the "witnesses for both the defense and the prosecution agreed that [the defendant] posed a continuing danger to elderly women." Id. The prosecution argued for the death penalty by noting petitioner's admitted propensity to attack elderly women, calling the death penalty "an act of self-defense." Id. The defendant responded by arguing that his violent tendencies would be directed exclusively at elderly women, and so he would not pose a threat to society if he was imprisoned. Id. at 157–58, 114 S.Ct. at 2191.

In this context, the defendant requested that the jury be informed by the trial court that the only alternative sentence he would receive if the jury did not recommend death was life in prison without parole. Id. The trial court refused to so inform the jury, instead telling it that "[y]ou are instructed not to consider parole or parole eligibility in reaching your verdict." Id. at 160, 114 S.Ct. at 2192.

The Supreme Court held that the trial court's refusal to instruct the jury about the defendant's ineligibility for parole violated Due Process. The Court explained that Due Process demands that a defendant have the opportunity to rebut aggravating circumstances relied upon by the government in seeking the death penalty, and keeping the jury uninformed about the defendant's parole ineligibility prohibited the defendant from responding to the government's reliance on future dangerousness as a factor favoring death penalty. Id. at 167–68, 114 S.Ct. at 2196.

Chandler argues that he was also sentenced to death by a jury ignorant of the fact that his likely alternate sentence would be life in prison without parole. See U.S.S.G. § 2A1.1. Chandler also argues that the gov-

---

**29.** An emerging trend of courts has held that Simmons announced a "new rule" and cannot be applied retroactively under Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). See O'Dell v. Netherland, 95 F.3d 1214 (4th Cir.1996); Johnson v. Scott, 68 F.3d 106, 111 n. 11 (5th Cir.1995). The Eleventh Circuit has not reached the issue. See Ingram v. Zant, 26 F.3d 1047, 1054 n. 5 (11th Cir.1994). However, the Teague bar on retroactive application of new rules is inapplicable here, because Chan-

dler's conviction became "final" three days after Simmons was decided. Simmons was decided June 17, 1994; Chandler's petition for certiorari was denied on June 20, 1994. See 512 U.S. 1227, 114 S.Ct. 2724, 129 L.Ed.2d 848. The Supreme Court has held that a conviction becomes final when certiorari is denied, see Caspari v. Bohlen, 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994), and so the Court must analyze Chandler's claim in light of Simmons.

ernment argued for the death penalty here by emphasizing Chandler's future dangerousness; Chandler asserts that he was entitled, under *Simmons,* to a jury instruction to the effect that he would receive life in prison without parole if he was not executed.

To establish that the government relied upon Chandler's future dangerousness as a sentencing criterion, Chandler notes several comments of the prosecutors made during the closing arguments at Chandler's sentencing hearing. For example, prosecutor Davis made the following argument:

I submit to you that the government has established all of these aggravating factors beyond a reasonable doubt. If you agree that the first factor exists and at least one of the other two factors exist, then there must—then these must be weighed by themselves and against any mitigating factors. One such factor claimed by the defendant is the fact that Charles Ray Jarrell is not also facing the death penalty, and I would like to speak to that briefly.

You've heard several times that in return for his cooperation in this case the government, the United States government and the State of Alabama have agreed to recommend a 25–year sentence without parole for Charles Ray Jarrell. Charles Ray Jarrell, for him, that might as well be a lifetime. This is to cover his entire involvement in the drug operation and in the death of Marlin Shuler.

Now the defendant will no doubt argue that this simply is not somehow not [sic] fair. Charles Ray Jarrell came here before you and testified before you. You were able to hear his testimony. He came in here, admitted what he did, came in here and told you what he did, what kind of person he is and isn't anything to write home about, there is no question about that. But I submit to you that a man that was willing to solicit two different prospective killers on at least three different occasions, a man who was willing to provide money to people to perform the act, a man who was willing to provide weapons to complete the act and a man who is cunning and manipulative *is a far more dangerous individual* than a self-confessed town drunk living hand to mouth who allows himself to be manipulated into actually doing this terrible act.

David Ronald Chandler is by virtue of his intellectual ability *a far more dangerous man* than Charles Ray Jarrell would ever hope to be.

(Tr. 12–55 to –57) (emphasis added). In addition, prosecutor Hubbard described Chandler as a "diabolical" person "who was possessed with the idea that marijuana and money was more important than life." (Tr. 12–74). Hubbard also described the death penalty as "society's self defense. This is what has to be done in these situations. Ronnie Chandler put us all in this position. He put you in this position. It's a crime against all of us and the appropriate sentence has to be rendered." (Tr. 12–75).

Chandler interprets these comments as an argument to the jury that Chandler should be executed to prevent him from committing crimes in the future. As a result of this alleged reliance on future dangerousness, Chandler argues that he was entitled to have the trial court inform the jury of the alternative sentence of life in prison without parole.

■ The Court disagrees. *Simmons* is distinguishable from this case because here the government did not rely on Chandler's future dangerousness as a sentencing criterion. Although some of the prosecutors' closing statements, when read is isolation, are similar to those in *Simmons,* the context of those remarks is entirely different. In *Simmons,* there was evidence presented at the sentencing hearing that established that the defendant had a psychological disorder that caused him to assault elderly women. Witnesses for both the defense and prosecution agreed that Simmons would likely attack other women if released. The prosecution and defense explicitly litigated the issue of future dangerousness; the defendant even presented evidence that he would not exhibit violent tendencies while in prison, away from elderly women.

Here, by contrast, there was absolutely no evidence suggesting that Chandler suffered from a mental problem that rendered him powerless to resist the urge to violence.

Parts of the prosecutors' closing arguments, when read in isolation, could be read to refer to future dangerousness, but the context of those arguments belies any such inference. One of the mitigating factors Chandler sought to rely upon was the fact that Charles Ray Jarrell, an allegedly equally culpable party to the Shuler murder, would not be receiving the death penalty. The portions of the closing arguments referring to Chandler as "dangerous" were merely responses to Chandler's argument that Charles Ray Jarrell was equally culpable. In seeking to demonstrate that Chandler was the more culpable party, the prosecutors stressed Chandler's planning and premeditation of the Shuler murder, and Charles Ray Jarrell's dependence on Chandler. Read in this light, the prosecutors' arguments had nothing to do with Chandler's future dangerousness; rather, they were rebuttals of Chandler's proffered mitigation argument.

Because the government did not place Chandler's future dangerousness into issue at the sentencing hearing, *Simmons* does not apply here. Claim III F is due to be denied.

### III G: Stringer v. Black

Chandler's next argument is that the aggravating factors used by the government were impermissibly broad and vague, and did not serve the goal of meaningfully narrowing the class of death-eligible offenders. *See Stringer v. Black*, 503 U.S. 222, 228, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992). *See also Maynard v. Cartwright*, 486 U.S. 356, 363–64, 108 S.Ct. 1853, 1858–59, 100 L.Ed.2d 372 (1988). Rather, Chandler argues that the broad aggravating factors tend to skew the results of sentencing hearings in favor of the death penalty.

The government's principal response to this argument is that it was raised and rejected on direct appeal. Chandler attempts to distinguish his present argument from that rejected by the Eleventh Circuit, but the Court agrees that the Eleventh Circuit's holding controls this issue.

On direct appeal, the Eleventh Circuit described Chandler's argument as follows:

Chandler argues that due to the breadth of § 848(e), the finding of guilt under Section 848(e) does not satisfy the constitutional requirement that a capital statute must genuinely narrow the class of defendants eligible for the death penalty. .... Chandler further contends that because one of the aggravating factors duplicates a jury finding at the guilt phase, the jury's weighing process is skewed in favor of imposing the death penalty.

*United States v. Chandler*, 996 F.2d at 1092.

Here, Chandler argues that the aggravating factor set forth in § 848(n)(1) is impermissibly broad and fails to meaningfully narrow the class of death-eligible offenders. Section 848(n)(1) contains the aggravating factor that is duplicated from the guilt phase of the trial. This argument is not distinguishable from that raised on direct appeal. In its opinion, the Eleventh Circuit held as follows:

[i]nitially, the statute requires the jury to find that the defendant intentionally committed homicide in connection with large scale drug trafficking. The statute does not embrace anyone who committed murder, but only those who did so in connection with a continuing criminal enterprise. Thus, Section 848(e) sufficiently narrows the class of death eligible defendants at the guilt phase.

*United States v. Chandler*, 996 F.2d at 1093 (emphasis added). This Court views the Eleventh Circuit's holding as directly rejecting Chandler's current argument that § 848(n)(1) is "impermissibly broad." Thus, this argument cannot now avail Chandler, and claim III G is due to be denied.

### III H: Jury unanimity at sentencing

Chandler contends that this Court's instructions and verdict form required the jury to come to a unanimous verdict either in favor of or against the death penalty. This, Chandler argues, violated § 848(k–l), as well as the Fifth and Eighth Amendments. Chandler has proffered the affidavit of one of his jurors, which recites that she did not wish to vote for the death penalty, but felt forced to do so because she believed that a non-death verdict needed to be unanimous.

This argument was raised on Chandler's direct appeal and rejected. The Eleventh Circuit acknowledged Chandler's present argument, that § 848(k–*l* ) "provide that in the event the jury cannot unanimously recommend a death sentence, the district court must sentence the defendant to some non-death sentence." *United States v. Chandler,* 996 F.2d at 1088. The Court of Appeals then went on to find that this Court's jury instructions had not coerced a recommendation of death. *Id.* at 1089. The Eleventh Circuit's holding on this issue is binding here.

■■■ In addition, the Court rejects the juror affidavit submitted by Chandler. Rule 606(b) of the Federal Rules of Evidence prevents a juror from impeaching his or her verdict except in instances of "extraneous prejudicial information" or "outside influence." Chandler's proffered affidavit describes the juror's mental reactions to the Court's jury charge, and does not fit into either of the exceptions in Rule 606(b). Thus, the Court cannot consider it. *See Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).[30] Claim III H is due to be denied.

### III I: Connection between the CCE and the Shuler murder

Chandler once again argues that this Court's jury instructions allowed the jury to convict him of a murder committed during Chandler's involvement in the continuing criminal enterprise, but not connected to the CCE. Chandler argues that Congress has no power under the Commerce Clause to punish such behavior, and so his conviction was unconstitutional.

The Court has already considered this argument twice and concluded that it has no merit. *See* claims III D 2 f, III E 4. In short, the Eleventh Circuit held that this Court's instructions "clearly" informed the

jury of the requirement of a connection between the Shuler murder and the CCE. *See United States v. Chandler,* 996 F.2d at 1098. Claim III I is due to be denied.

### III J: Burroughs/McFry Evidence

Here, Chandler again argues that the evidence concerning the Burroughs and McFry disappearances was improperly admitted at the sentencing hearing. Chandler also argues that the Court should have given a separate burden of proof instruction with respect to these "unadjudicated crimes."

The Court has already addressed the merits of this claim in connection with claims III D 3 d and III E 3. The Burroughs/McFry evidence was properly admitted and no separate burden of proof instruction was necessary. Claim III J is due to be denied.

### III K: The "sympathy" instruction

Chandler argues that the Court's instruction to the jury to avoid the influence of passion, prejudice, or sympathy was improper. The Court has already concluded that the instruction was proper under *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). *See* claims III E 2 and III D 3 e. Claim III K is due to be denied for the same reasons.

### III L: Failure to charge on multiple conspiracies

Chandler argues that the Court erred in failing to instruct the jury on multiple conspiracies. The Court has already concluded that Chandler was not entitled to a multiple conspiracy instruction. *See* claims III E 1 and III D 2 o. Claim III L is thus due to be denied.

**30.** The Court feels compelled to note for the record that it is hardly surprising that Chandler's attorneys could have obtained a juror affidavit impeaching the verdict. On July 26, 1995, the Court filed into the record a copy of a letter it received from another juror, along with a reply letter sent to that juror by the Court. Both letters reveal a concerted effort by Chandler's attorneys to contact jurors. The juror's letter expressed concern about jurors being "intimidated" by Chandler's attorneys. The Court's responsive letter acknowledged that Chandler's attorneys had contacted jurors and expressed concern over "possible intimidation by the nature of the questions and comments." The Court's letter recites that the juror had complained that Chandler's lawyers had shared the comments of other jurors with her.

*III M: Sentencing on non-capital counts*

Chandler argues that there were three errors in the sentencing with respect to the non-capital counts. First, he argues that this Court erred by not allowing objections after the sentence was imposed. Second, Chandler argues that the sentence with respect to Count II was erroneous, because it treated the Shuler murder as an overt act in furtherance of the Count I conspiracy. Chandler argues that the jury's verdict does not support a connection between Shuler's murder and the CCE. Third, Chandler argues that use of the Shuler murder to increase his sentence on Count II amounted to impermissible "double counting" of that offense.

The Eleventh Circuit expressly rejected Chandler's first argument on direct appeal. The Court of Appeals noted that "after imposing the sentences, the district court specifically asked counsel if there were any objections other than those that had been raised during the sentencing hearing. Chandler's claim is without merit." *United States v. Chandler,* 996 F.2d at 1106.

Chandler's second argument is similarly without merit. The Eleventh Circuit and this Court have already rejected Chandler's argument that the jury instructions did not convey the requirement of a connection between the continuing criminal enterprise and the Shuler murder. *See* claims III I, III E 4, III D 2 f. The jury found a connection between the CCE and the Shuler murder, and so the murder was relevant to the CCE sentence.

■ Chandler's third argument, concerning "double counting" of the Shuler murder, was presented to the Eleventh Circuit, but the Court of Appeals declined to rule on it. This Court does the same. Unless Chandler is relieved of his death sentence and resentenced with respect to Count II, the "double counting" issue is moot. Thus, claim III M is due to be denied.

*III N: Challenges to the Department of Justice Execution Regulations*

Chandler makes several legal challenges to the Department of Justice's lethal injection regulations ("the regulations"), 28 C.F.R. §§ 26.1–26.5. Chandler was convicted and sentenced in April, 1991, and at that time, there was no procedure in place for the execution of federal offenders. *See* Court's Order of May 30, 1991, at 4.[31] Congress has never statutorily determined the method for execution to be applied to Chandler's case.[32] However, the Department of Justice promulgated the regulations, effective February 18, 1993, to provide the procedure for executions like Chandler's. The government has indicated its intention to execute Chandler in accordance with the regulations, and has filed a proposed judgment with the Court, as required by § 26.2.

*1. The Department's authority to issue the regulations*

Chandler first argues that the Department of Justice had no authority to enact the regulations. Chandler argues that the regulations are expressions of substantive policy that the DOJ is powerless to make, and also argues that the DOJ's policymaking violates the Constitutional non-delegation principle.

■ The Court rejects these arguments. As an initial matter, the regulations are not "substantive" expressions of policy. Rather, they are merely a procedural specification of how Chandler's sentence (which was authorized by Congress) is to be carried out. As the Eleventh Circuit held on direct appeal, "[f]uture legislation would not increase the punishment, but would only provide for the method by which the punishment would be carried out; a change in procedure, not the sentence." *United States v. Chandler,* 996 F.2d at 1096. The Department clearly has the authority (and the obligation) to establish procedures for carrying out the sentence dictated by Congress under § 848(e). *See* 5 U.S.C. § 301, 18 U.S.C. § 4001(b).

---

**31.** 18 U.S.C. § 3566 had formerly specified the procedures used for executing federal prisoners. However, Congress repealed § 3566 in 1984, leaving no statutory procedure in place for carrying out federal death sentences.

**32.** Although the 1994 Crime Act contained provisions for executing certain federal death sentences, the parties have stipulated that the 1994 Act's provisions do not apply to Chandler.

■ The Court also rejects Chandler's non-delegation argument. Congress may delegate rule-making authority to an executive agency as long as Congress provides some "intelligible principle" for the agency to follow. *See, e.g., Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 654-55, 102 L.Ed.2d 714 (1989). Here, Congress has provided the principle that certain persons convicted under § 848(e) should be executed. This statutory guidance clearly passes muster under the law "intelligible principle" test. Claim III N 1 is due to be denied.

### 2. Preemption by the 1994 Crime Act

The parties have stipulated that the 1994 Crime Act does not apply to this case. Therefore, claim III N 2 is due to be denied.

### 3. Retroactive rule-making under the APA

Chandler next argues that the regulations violate the Administrative Procedure Act, 5 U.S.C. §§ 551(4) and 553, because they are retroactive. Chandler relies on *Georgetown University Hospital v. Bowen,* 821 F.2d 750 (D.C.Cir.1987), *aff'd,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

■ However, *Bowen* does not control here. *Bowen* dealt with the Secretary of Health and Human Services' retroactive application of limits on reimbursement to hospitals for the expenses of treating Medicare-insured individuals. *See Bowen,* 488 U.S. at 205-06, 109 S.Ct. at 470-71. The regulation at issue was thus clearly "substantive"; it affected the amount of money due to the hospitals. Here, by contrast, the regulations do not alter Chandler's sentence or any other substantive right, but merely prescribe the procedure to be used for carrying the sentence out. This procedural clarification of the method of Chandler's execution can be applied retroactively without offending *Bowen* or the APA. *See Pope v. Shalala,* 998 F.2d 473, 482-83 (7th Cir.1993).

### 4. The regulations as a bill of attainder

Chandler's next argument is that the regulations are an unconstitutional bill of attainder, because they were directed at a specific group of individuals. The Court rejects this argument.

A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 846-47, 104 S.Ct. 3348, 3352, 82 L.Ed.2d 632 (1984); *Little v. City of North Miami,* 805 F.2d 962, 965 (11th Cir.1986). *See also United States v. Brown,* 381 U.S. 437, 442, 85 S.Ct. 1707, 1711-12, 14 L.Ed.2d 484 (1965) (the Bill of Attainder clause was designed to prevent "trial by legislature").

■ Here, Chandler was tried in a court and convicted and sentenced to death by a jury. The regulations determined neither Chandler's guilt under § 848(e) nor the degree of his punishment. Rather, as noted above, the regulations are merely procedures for carrying out the punishment imposed by the jury. Chandler was not subject to "trial by legislature" or trial by the executive branch, and so his bill of attainder argument fails. Claim III N 4 is due to be denied.

### 5. The regulations and the Ex Post Facto clause

■ Chandler argues that the regulations violate the Constitutional prohibition on ex post facto criminal laws. The Court rejects this claim, because the Eleventh Circuit has already held that any designation of the method for Chandler's execution would not increase the quantum of Chandler's punishment, and so does not violate the Ex Post Facto clause. *See United States v. Chandler,* 996 F.2d at 1095-96. *See also Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). Claim III N 5 is due to be denied.

### 6. Cruel and Unusual punishment

Chandler's final argument regarding the regulations is that the regulations violate the Constitutional prohibition against cruel and unusual punishment because the specified method of execution—lethal injection—is physically cruel and inhumane.

■ The Department of Justice concluded that lethal injection was the most humane method of execution available. *See* 58 F.R.

4898, 4900 (Jan. 19, 1993). In addition, the only court that has examined a similar challenge to execution by lethal injection has rejected it. *See Woolls v. McCotter,* 798 F.2d 695, 697–98 (5th Cir.1986). Chandler has failed to show that the DOJ regulations prescribe a method of execution that is physically cruel or unnecessarily painful, and thus claim III N 6 is due to be denied.

### *III O: Constitutional challenges to execution under the 1994 Crime Act*

The parties have stipulated that the 1994 Act does not apply in this case. Thus, claims III O 1 and III O 2 are due to be denied.

### *Conclusion*

In accordance with the foregoing discussion, findings of fact, and conclusions of law, it is ORDERED, ADJUDGED, and DECREED that the following claims in defendant's March 20, 1995 motion to vacate and for a new trial, as amended on July 24, 1995, September 5, 1995, and January 18, 1996, are DENIED:

—claim III D 1 a;
—claim III D 1 b;
—claim III D 1 c;
—claim III D 1 d;
—claim III D 2 a;
—claim III D 2 b;
—claim III D 2 c;
—claim III D 2 d;
—claim III D 2 e;
—claim III D 2 f;
—claim III D 2 g;
—claim III D 2 h;
—claim III D 2 i;
—claim III D 2 j;
—claim III D 2 k;
—claim III D 2 l;
—claim III D 2 m;
—claim III D 2 n;
—claim III D 2 o;
—claim III D 2 p;
—claim III D 2 q;
—claim III D 2 r;
—claim III D 2 s;
—claim III D 3 a;
—claim III D 3 b;
—claim III D 3 c;
—claim III D 3 d;
—claim III D 3 e;
—claim III D 3 f;
—claim III E 1;
—claim III E 2;
—claim III E 3;
—claim III E 4;
—claim III E 5;
—claim III F;
—claim III G;
—claim III H;
—claim III I;
—claim III J;
—claim III K;
—claim III L;
—claim III M;
—claim III N 1;
—claim III N 2;
—claim III N 3;
—claim III N 4;
—claim III N 5;
—claim III N 6;
—claim III O 1; and
—claim III O 2.